STATE OF NORTH CAROLINA v. GEORGE DAMEL YOUNG

No. COA08-872

(Filed 5 May 2009)

**1. Homicide— second-degree murder—instruction—aiding and abetting**

The trial court did not err in a second-degree murder case by instructing the jury on the theory of aiding and abetting even though defendant contends there was insufficient evidence to show he intentionally aided a fellow gang member or knew that he was going to shoot the victim because: (1) there was no factual issue preventing defendant from having the requisite *mens rea* for the crime; and (2) the evidence was sufficient to support the conclusion that the shooting was committed by the gang member, defendant encouraged and aided the gang member, and defendant's actions contributed to the commission of the crime.

**2. Homicide— second-degree murder—refusal to instruct on lesser-included offense of involuntary manslaughter**

The trial court did not err in a second-degree murder case by refusing to instruct on the lesser-included offense of involuntary manslaughter because: (1) involuntary manslaughter is the unintentional killing of a human being without malice, and in contrast the intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice; and (2) taken in the light most favorable to defendant, the evidence indicated that either defendant intentionally fired the shot that killed the victim or defendant aided and abetted the commission of an intentional crime. Contrary to the State's assertion, defense counsel properly preserved this issue for review and no additional objection at the time of the jury charge was required since counsel objected to the trial court's ruling at the time of the charge conference.

Appeal by defendant from judgment entered 2 July 2007 by Judge Ronald L. Stephens in Superior Court, Wake County. Heard in the Court of Appeals 23 February 2009.

*Attorney General Roy Cooper, by Assistant Solicitor General John F. Maddrey, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for defendant-appellant.*

WYNN, Judge.

Under North Carolina law, to prove aiding and abetting the State must show, *inter alia*, that "the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime."[1] Here, Defendant George Damel Young argues the State failed to show he knowingly aided James Batiste in murdering Douglas Jamal Mangum. Because evidence in the record supports the conclusion that Defendant encouraged and aided James Batiste in murdering Douglas Mangum, we uphold his conviction.

At trial, the evidence (pertinent to supporting the jury's verdict finding Defendant guilty of second-degree murder on the theory of aiding and abetting) tended to show that about 9:30 p.m. on 4 June 2006, Douglas Mangum died from a single gunshot wound, inflicted

---

1. *State v. Goode*, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999) (citation omitted).

**STATE v. YOUNG**

[196 N.C. App. 691 2009)]

while he was standing in the driveway of his Holly Springs' residence. Among the witnesses testifying for the State were Sharrod Mangum (Douglas Mangum's brother), Michael George (a relative of Douglas Mangum), and James Batiste (a member of a gang called "the Crips" to which Defendant also allegedly belonged).

Sharrod Mangum testified that shortly after his brother left the house to "get some air," he heard a shot and saw his brother running up the driveway toward the house. He saw the passenger's side window of a black vehicle being rolled up as it passed in front of the house.

Michael George testified that he heard two gunshots while standing outside of his house that evening. He observed "a black Suburban or Tahoe just stopped right in front of the house right in the road . . . it crept by, and when it got closer to Blalock [a cross street], it kind of picked up the [sic] speed and just took off." He said that the vehicle's headlights were off.

James Batiste, who at the time of the trial had been charged as an accessory-after-the-fact, testified that he and Defendant first met when Batiste was twelve or thirteen years old. They lived in the same neighborhood, were "tight," and were members of the Crips at the time of the shooting. He described Defendant as a high-ranking "original gangster" or "big man" in the Crips, and as instrumental in Batiste's decision to leave his former gang, Folk Nation, to become a low-level Crips' "foot soldier."

Batiste testified that on 4 June 2006 he called Defendant to come and get him from Ricky Spruill's house, where he had been drinking throughout the day. Defendant arrived to pick him up; got into an argument during a telephone call with Batiste's cousin, Sharise Cofield; and told Batiste that he was going to go fight Cofield on "the hill"—an area of Holly Springs associated with another gang called "the Bloods." Defendant then told Batiste to call "P" and "Slug" so he'd have some back-up in the fight. Defendant drove his black Chevrolet Tahoe to a parking lot, picked up P and Slug, and drove to "the hill." Batiste rode in the front passenger's seat during the entire trip.

Batiste stated that, when they arrived near the hill, they saw a "big tent with a lot of people" and decided to "circle back around." As they drove down West Holly Springs Road, they saw "the boy with the red shirt"—the color associated with members of the Bloods. De-

fendant stopped the car, grabbed the rifle, and aimed it outside the passenger's side window. Batiste stated, "When I seen (sic) him pick the gun up, I grabbed it because he started aiming it and I grabbed it, tried to grab it from him, we (sic) tussling. . . . and it just went off." He testified that Defendant laughed and said, "I know that shirt is really red now." Afterward, Defendant drove off and "tossed" the shell casing out of the driver's side window as they drove down a dirt road. He then dropped Batiste, P, and Slug off in Cary.

The State also presented testimony from David Williams, the owner of Five Points Auto in Fuquay-Varina, who stated that on 20 May 2006 he sold a 1996 Chevrolet Tahoe to William Talavera, and that Defendant traded in his 1992 Mercedes Benz to satisfy part of the down payment. The State also presented evidence the Tahoe was cleaned at a local car wash the day after the shooting, Defendant purchased a nine millimeter rifle from a pawn shop, and the shot that killed Douglas Mangum was fired from his rifle.

Defendant offered a different version of the events on 4 June 2006 through his testimony and that of his second cousin, Ricky Spruill. Spruill testified that Batiste had spent the night at his house and that Batiste had gotten into a fight with an individual named "Kenny" that afternoon. Spruill stated that there were holes in his wall, the bed and dresser had been turned over, and Batiste had a "face full of blood." He heard Kenny arguing and antagonizing Batiste on the phone, saying he got the best of him that day. Later, Spruill and Defendant teased and laughed at Batiste for getting "whooped like that." Batiste told Spruill, "I'm going to prove myself tonight." Spruill also testified that Batiste called him days after the shooting and confessed to having shot someone.

Defendant testified that he was planning to take Batiste to his mother's home when Batiste received a call from P and Slug asking for a ride. After picking them up, Defendant followed Batiste's directions to his mother's house, which Defendant knew was somewhere near West Holly Springs Road. Defendant stated that Batiste told him "to hold up" so he stopped, waiting for the passengers to get out. Batiste then grabbed the gun and fired a shot. Defendant stated, "I didn't know who he shot or what he shot." Defendant said he didn't know Batiste was going to shoot anyone and did not discuss with him any plan to shoot anyone. Defendant denied knowing Douglas Mangum, making any comments about Douglas Mangum's shirt, or throwing the shell casing out of the window. He stated that Batiste kept the rifle and later told him "it's in the water," and

that he did not report the incident because he feared Batiste would harm his son.

Defendant also testified that he "shared" a black Chevrolet Tahoe with William Talavera, and that he was driving the Tahoe on the evening of 4 June. On cross-examination, Defendant stated that the day after the shooting, he and Mr. Talavera drove the Tahoe to Charlotte, and that he later drove the vehicle to Brooklyn, New York and back.

Despite searches of the area, the police did not locate the rifle or the gun shell. Further, neither P nor Slug testified at the trial.

On 8 August 2006, Defendant was indicted for the first-degree murder of Douglas Mangum; however, the State chose not to prosecute the matter capitally. At his trial and following the conclusion of the evidence, the trial court granted Defendant's motion to dismiss the first-degree murder charge. Thereafter, the trial court submitted the charge of second-degree murder to the jury on the alternate legal theories that Defendant was guilty as the actual perpetrator of the crime or as an aider and abetter of the crime. The jury returned a verdict of guilty on the charge of second-degree murder on the theory of aiding and abetting.

Following the trial court's judgment, consistent with the jury's verdict, and sentence of 96 to 125 months' imprisonment, Defendant appealed to this Court. He argues that the trial court erred by (I) instructing the jury on the theory of aiding and abetting, and (II) refusing to instruct the jury on the lesser-included offense of involuntary manslaughter.

I.

[1] Defendant first argues that the trial court erred in instructing the jury on the theory of aiding and abetting the perpetrator of the crime because the State presented insufficient evidence to show that Defendant intentionally aided Batiste or knew that he was going to shoot Douglas Mangum. In charging the jury, the trial court stated that Defendant may be found guilty of second-degree murder on one of two legal theories—"[a]s a principal to the crime" or "as an aider and abetter of the crime." Thereafter, the jury found Defendant guilty of second-degree murder under the theory that he aided and abetted the principal or actual perpetrator, James Batiste.

Under North Carolina law, a jury instruction on aiding and abetting is supported by sufficient evidence if there is evidence that "(i)

the crime was committed by some other person; (ii) the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime; and (iii) the defendant's actions or statements caused or contributed to the commission of the crime by that other person." *Goode*, 350 N.C. at 260, 512 S.E.2d at 422 (citation omitted). Further,

> [a] person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission; to be guilty he must aid or actively encourage the person committing the crime or in some way communicate to this person his intention to assist in its commission. The communication or intent to aid does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators.

*Id.* at 260, 512 S.E.2d at 422 (internal citations omitted). Additionally, because intent is rarely provable by direct evidence, "[i]t must ordinarily be proved by circumstances from which it may be inferred." *State v. Bell*, 285 N.C. 746, 750, 208 S.E.2d 506, 508 (1974) *overruled in part on other grounds by State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993).

Defendant relies on this Court's recent decision in *State v. Bowman*, 188 N.C. App. 635 , 647, 656 S.E.2d 638, 649 (2008), arguing that "[i]t is not enough for the State to prove that a defendant committed acts which actively assisted the perpetrator in the commission of the crime." Defendant's reliance on *Bowman* is misplaced. In *Bowman*, this Court ordered a new trial based upon the trial court's denial of the defendant's request for an instruction that he had to have known the age of the victim to be convicted of aiding and abetting statutory rape. *Id.* Here, unlike the statutory rape charge in *Bowman*, there is no factual issue that prevents Defendant from having the requisite *mens rea* for the crime of second-degree murder. To establish that Defendant aided and abetted in the commission of second-degree murder, it is sufficient to present circumstantial evidence at trial that would permit a reasonable inference of Defendant's knowledge and intent to encourage and assist James Batiste in the killing of Douglas Mangum.

Indeed, the evidence presented at trial tended to show that Defendant drove Batiste to the neighborhood; stopped the vehicle in front of Douglas Mangum's residence with the headlights off; sped away from the scene after the shooting; threw the shell casing out of

the car window; and dropped Batiste and the other passengers off in Cary, telling them to "get low" or "get missing." There was also evidence that the rifle used in the shooting belonged to Defendant, Defendant frequently kept the loaded rifle in the vehicle, and the vehicle was detailed before Defendant left town the next day. Further, the trial court heard testimony that Defendant and Batiste were "tight"; they were both members of the Crips; Defendant had a superior rank of "original gangster" to Batiste's low-rank of "foot soldier"; and Defendant knew that Batiste was planning to redeem his reputation that night in a neighborhood known as Bloods' territory.

We hold that this evidence was sufficient to support a jury instruction on aiding and abetting Batiste in the killing of Douglas Mangum. The evidence presented at trial supports the conclusion that the shooting was committed by Batiste, Defendant encouraged and aided Batiste, and Defendant's actions contributed to the commission of the crime. *See, e.g., State v. Baskin,* 190 N.C. App. 102, 110-11, 660 S.E.2d 566, 572 (2008) (evidence that defendant drove the getaway car while holding the victim's property was sufficient for a jury instruction on aiding and abetting felony breaking and entering a motor vehicle); *State v. Little,* 278 N.C. 484, 488, 180 S.E.2d 17, 20 (1971) (evidence that defendant borrowed a shotgun used in the shooting, drove the principals to the site of the shooting, opened the trunk containing shotguns, and drove away afterward was sufficient for a jury instruction on aiding and abetting manslaughter). Accordingly, we uphold the trial court's jury instruction on a theory of aiding and abetting second-degree murder.

## II.

**[2]** Defendant also argues that the trial court erred in refusing to instruct the jury on the lesser-included offense of involuntary manslaughter. However, the State contends that Defendant failed to properly preserve this objection for appeal because defense counsel did not object to the exclusion of involuntary manslaughter from the jury instruction at the time of the charge pursuant to Rules 10(b)(2) and 10(c)(2) of the N.C. Rules of Appellate Procedure. We disagree.

In *Wall v. Stout,* 310 N.C. 184, 188, 311 S.E.2d 571, 574 (1984), our Supreme Court held that Rule 10(b)(2) does not require a party "to repeat their objections to the jury instructions after the charge was given in order to preserve their objections for appellate review[,]" where the party's objection was stated at the charge conference. Here, defense counsel presented his request for a jury instruction on

the charge of involuntary manslaughter at the charge conference; the trial court denied the request, and noted the objection. By objecting to the trial court's ruling at the time of the charge conference, defense counsel properly preserved the issue for review by this Court. Contrary to the State's contention, no additional objection at the time of the jury charge was required. *See id.* at 188, 311 S.E.2d at 574. Accordingly, the issue of whether the jury should have been instructed on involuntary manslaughter is properly before us.

Defendant argues that the trial court erred by failing to instruct the jury on the lesser-included offense of involuntary manslaughter because there was evidence presented at trial to permit a reasonable jury to find that his actions "constituted culpable negligence." A defendant is entitled to instruction on a lesser-included offense "only when there is evidence from which the jury could find that such included crime of lesser degree was committed." *State v. Hicks*, 241 N.C. 156, 159, 84 S.E.2d 545, 547 (1954). "Conversely, where the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element, no instruction on a lesser included offense is required." *State v. James*, 342 N.C. 589, 594, 466 S.E.2d 710, 714 (1996) (internal quotation marks and citations omitted).

"Involuntary manslaughter is the unintentional killing of a human being *without* malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Redfern*, 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976) (emphasis added) (citation omitted), *overruled in part on other grounds by State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993). Additionally, "[t]he intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice." *State v. Judge*, 308 N.C. 658, 661, 303 S.E.2d 817, 820 (1983). Here, the evidence presented at trial, taken in the light most favorable to the Defendant, indicates that either Defendant intentionally fired the shot that killed the victim or Defendant aided and abetted the commission of an intentional crime. Having found positive evidence on the element of malice and no evidence that the victim's death resulted from unintentional conduct, we find no error and uphold the ruling of the trial court.

No error.

Chief Judge MARTIN and Judge ERVIN concur.