STATE OF NORTH CAROLINA v. ROBERT FRANK DEBIASE

No. COA10-113

(Filed 3 May 2011)

**Homicide— second-degree murder—erroneous failure to instruct on lesser-included offense—involuntary manslaughter**

 The trial court erred in a second-degree murder case by failing to instruct the jury on the lesser-included offense of involuntary manslaughter, and defendant was entitled to a new trial. There was a reasonable possibility that the jury might have concluded that defendant acted without intent to kill or inflict serious bodily injury.

Appeal by defendant from judgment entered 8 May 2009 by Judge Alan Z. Thornburg in Transylvania County Superior Court. Heard in the Court of Appeals 14 September 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Charles E. Reece, for the State.*

*Duncan B. McCormick, for Defendant.*

ERVIN, Judge.

Defendant Robert Frank Debiase appeals from a judgment sentencing him to a minimum term of 170 months and a maximum term of 213 months imprisonment in the custody of the North Carolina Department of Correction based on his conviction for second degree murder. On appeal, Defendant contends that he is entitled to a new trial because the trial court erroneously failed to instruct the jury on the lesser-included offense of involuntary manslaughter. After careful consideration of Defendant's challenge to the trial court's judgment in light of the record and the applicable law, we conclude that Defendant's contention has merit, so that he is entitled to a new trial.

### I. Factual Background

### A. Substantive Facts

### 1. Background and Preliminary Information

On 26 May 2007, Defendant, Christopher Lien and approximately twenty to thirty other people attended a bonfire party hosted by Matt Allender. At some point during the party, Defendant approached Mr. Lien's girlfriend, Concetta Cafaro, and asked if she wanted to consume OxyContin with him. Defendant's suggestion upset Mr. Lien, resulting in an argument between the two men, who did not know each other. Eventually, the argument degenerated into a fight, during which Mr. Lien sustained a "gaping incise wound [to] his neck" resulting in his death.

The wound that killed Mr. Lien was eleven and one-half inches long, three inches wide, and, at its deepest point, penetrated two inches into the soft tissue of Mr. Lien's neck. Others described the wound as "a large laceration from right back behind the neck here to running the V in the sternum," a "[v]ery large laceration with a large hole" on the "left side of his throat" that was "significantly deep," "a cut from one part of the face all the way down into the chest," and "a gaping wound on his neck on the left side of his neck." According to Dr. Cynthia Gardner, the forensic pathologist who autopsied Mr. Lien's body, this wound severed Mr. Lien's carotid artery, jugular vein, and trachea, causing massive blood loss and difficulty in breathing. In addition, Mr. Lien sustained a "superficial" or "shallow" "incise wound on [his] left ear, basically on the earlobe." Dr. Gardner testified that both injuries could have been caused by a broken, but not an unbroken, beer bottle. In order for the fatal injury to have resulted from a fall, Dr. Gardner believed that it would have been necessary

for Mr. Lien to have landed on an object that was at least eleven inches in length. Dr. Gardner opined that the injury that led to Mr. Lien's death could not have resulted from rolling around in an area strewn with broken bottles. However, Dr. Gardner did conclude that the distinct nature of the two wounds indicated that they were "caused by a separate action." Finally, Mr. Lien had abrasions on his wrist and knees and post-mortem first and second degree burns to his face, neck, torso, and arms.

A number of witnesses, most of whom admitted to having consumed various quantities of alcohol[1], provided contradictory accounts of the altercation between Defendant and Mr. Lien. Several of them commented on the fast-paced nature of the events that occurred at the time of Mr. Lien's death, stating at various points during trial that the entire incident lasted only ten seconds, that there was time for only one blow, that "[i]t was a really fast ordeal," and "it happened so quick."

### 2. Confrontation at the Campfire

The testimony of the eyewitnesses concerning the altercation between Defendant and Mr. Lien can be summarized as follows:

### a. State's Evidence

According to Ian Armstrong, Defendant hit Mr. Lien with a beer bottle that he held in his right hand. After the bottle broke, the two combatants grappled with each other, at which point both of them fell into the fire, with Defendant on top of Mr. Lien. A group of partygoers removed Defendant from the fire and tried to extricate Mr. Lien from the flames as well. As the bystanders assisted Defendant, he was attempting to get off of Mr. Lien and out of the fire on his own. After Mr. Lien was removed from the fire, Defendant realized how badly Mr. Lien had been injured, told someone to "call 911," removed his shirt, and said that it should be used to "apply pressure to [Mr. Lien's] neck." In response, Defendant was told to "just leave [Mr. Lien] alone." Mr. Armstrong only saw a single blow, did not see anyone making any stabbing motions, and did not see any blood before the two men fell into the fire.

---

1. Both Defendant and Mr. Lien had consumed impairing substances on the evening in question. According to the autopsy report, Mr. Lien had a blood alcohol content of .18. Defendant admitted having consumed three beers and a shot of Jagermeister before arriving at the party, to drinking at least half a beer after his arrival, and to having a prescription bottle of Hydrocodone in his possession. Ms. Cafaro described Defendant as a "little speedy" and as acting as if he might have been using cocaine, although she did not see him consume any such substance.

Ms. Cafaro testified that, following an exchange of words between Defendant and Mr. Lien, Defendant was standing beside a car and holding a beer bottle. After Defendant and Mr. Lien started pushing each other, Defendant raised a beer bottle over his head, "used" the bottle on Mr. Lien's head "a couple times," and, subsequently, jabbed Mr. Lien "multiple times" with the bottle. Ms. Cafaro did not see the bottle break or know how it broke; however, when she looked at Mr. Lien, she realized that he had been cut. According to Ms. Cafaro, Defendant and Mr. Lien ceased fighting for "a moment," at which point Mr. Lien walked away holding his throat. However, Defendant "came behind, pushed him, and he fell on top of the fire." Once in the fire, Defendant "was like on top of [Mr. Lien] and was hitting him. He got like two hits in."

Shane Mooney said that, when he saw Defendant and Mr. Lien yelling at each other, he tried to separate the two men. After Mr. Mooney and other persons present parted Mr. Lien and Defendant, they ran toward each other. As they came together, Defendant "came down on [Mr. Lien's] head with a beer bottle," which broke on impact. Mr. Mooney thought that he heard the bottle break when Defendant hit Mr. Lien with it. According to Mr. Mooney, "it appeared that [Defendant] still had [the bottle] in his hand as he was punching [Mr. Lien] from underneath as well. And then they kind of locked up together, and [Mr. Lien] kind of went down, in which point [Defendant] wrapped him up and threw him into the fire on his back and proceeded to hit him in the face with his fist." Although Mr. Mooney did not see any blood or other signs of injury immediately after Defendant hit Mr. Lien with the bottle, it was fairly dark at the time that the blow was struck. At that point, Mr. Mooney pulled Defendant off of Mr. Lien. As Mr. Mooney pulled Mr. Lien out of the fire, he realized that he had blood on his hands.

Charles Pulliam stated that he did not remember any exchange of words between Defendant and Mr. Lien. According to Mr. Pulliam, Defendant hit Mr. Lien with the bottle; however, he did not know if the bottle was broken before it hit Mr. Lien. After the bottle struck Mr. Lien's cheek, Mr. Pulliam saw blood coming from the gash.

### b. Defendant's Evidence

Matthew Allender did not see Mr. Lien and Defendant argue or understand that they had exchanged harsh words. After hearing a bottle break, Mr. Allender turned to see what was happening, at which point he saw Mr. Lien and Defendant struggling. Both men

grabbed each other, and then fell into the fire. Mr. Allender did not see a bottle, never saw any stabbing or jabbing, and did not see any blood until Mr. Lien and Defendant fell.

Nikki Sentelle Denson turned when she heard a disturbance and observed Mr. Lien's body in the fire. Ms. Denson did not see any pushing or shoving and never saw Defendant strike Mr. Lien after Mr. Lien rolled through the fire. Similarly, Forrest Hensley did not see Defendant strike Mr. Lien. Instead, as the two men wrestled, he observed them fall into the fire.

Je'Hean Christopher Sharpe testified that, until Defendant asked Ms. Cafaro if she wanted to ingest drugs with him, everything was fine. At that point, Defendant and Mr. Lien began to have words with each other. As the argument escalated, Mr. Sharpe attempted to get Defendant to leave. At the time that Defendant began to depart, something caused both Defendant and Mr. Lien to get angrier. After Mr. Lien threatened Defendant, he came toward Defendant, who turned and hit Mr. Lien on the head with a beer bottle. Although Mr. Sharpe "felt the beer and the glass" when the bottle struck Mr. Lien's head, he did not see the bottle after Defendant hit Mr. Lien with it or see any stabbing motions. Defendant jumped out of the fire immediately after the two men fell in, but the same was not true of Mr. Lien. After Mr. Mooney pulled Mr. Lien out of the fire, Mr. Sharpe could see a lot of blood.

Euriel Turner testified that, after Defendant spoke with Ms. Cafaro, he saw Mr. Lien confront Defendant and punch Defendant in the chest. After that happened, Defendant threw up his hands and started to walk away. Although Mr. Turner attempted to calm Mr. Lien down, Mr. Lien pushed Mr. Turner aside and charged Defendant, who struck Mr. Lien on the side of the neck with a beer bottle. As Mr. Lien and Defendant wrestled, they tripped and fell into the fire, with Mr. Lien facing in a downwards direction.

Defendant, who testified on his own behalf, said that Mr. Lien became angry after Defendant offered Hydrocodone to Ms. Cafaro. After Mr. Lien pushed Defendant, three men grabbed Mr. Lien. When Defendant and Mr. Sharpe turned around, Mr. Lien escaped from the group that was holding him and charged at Defendant, who had two beers in his hand. At the time that Mr. Lien charged, Defendant turned, backed up a bit, swung the bottle, and hit Mr. Lien on the top of the head, at which point the bottle shattered. After backing off a few feet, Mr. Lien charged Defendant again. Defendant dropped the beer bottles, grabbed Mr. Lien, and struggled with him for a brief

interval before the two of them fell into the fire. Defendant testified that he reacted instinctively when he saw that Mr. Lien was charging at him by "turn[ing] around, . . . back[ing] up, and [swinging] the bottle," which "hit [Mr. Lien] over the top of the head."

Q.: Did you intend to kill Chris Lien?

A.: Not at all.

Q.: Well, did you intend to inflict serious injury on the person of Chris Lien?

A.: No, sir.

Q.: Why did you hit him with the beer bottle?

A.: I honestly—it was a reaction almost, it was a flash kind of just—he come toward me; and I was kind of being held; and I was afraid. I was afraid that he was going to come and hurt me.

When he realized how badly Mr. Lien had been hurt, Defendant "went down to him" and apologized. Defendant claimed that he "panicked and [was] in shock," explaining that he "didn't really know what to do" and that, since "people seemed mad," he "kind of just slowly turned [his] head down and walked away."

### 3. Events Following the Altercation

After the altercation, Defendant called his girlfriend to request that she pick him up and left the scene before law enforcement officers and emergency responders arrived. At first, Defendant attempted to check into a hotel in the hopes of "just get[ting] away." Ultimately, however, he went to his father's residence before turning himself in and making a statement to investigating officers. At his father's house, Defendant explained that he had been attacked at a party and reacted by hitting Mr. Lien on the head with a bottle.

During an interview with Special Agent Tom Ammons of the State Bureau of Investigation, Defendant indicated that Mr. Lien became irritated when he offered some Hydrocodone to Ms. Cafaro. After Mr. Lien pushed Defendant, a number of people intervened to separate them. At that point, Defendant was holding a full beer bottle by the neck. Defendant told Special Agent Ammons that "he knew that he would hit [Mr. Lien] with the beer bottle if [Mr. Lien] made [it] through the people." When Mr. Lien, who was not armed, came between the others and neared Defendant, Defendant "hit [Mr. Lien] with the beer bottle on the top back portion of his head." Defendant

put Mr. Lien in a headlock, the two men struggled, and both of them went to the ground, rolling over and through the campfire before they separated. After the fight ended, Defendant realized how badly Mr. Lien's neck had been cut.

### B. Procedural History

On 26 November 2007, the Transylvania County grand jury returned a bill of indictment charging Defendant with second degree murder. The charge against Defendant came on for trial before the trial court and a jury at the 27 April 2009 Criminal Session of Transylvania County Superior Court. After the close of all of the evidence, the trial court submitted the issue of whether Defendant was guilty of second degree murder, guilty of voluntary manslaughter or not guilty for the jury's consideration. On 8 May 2009, the jury returned a verdict convicting Defendant of second degree murder. At the ensuing sentencing hearing, the trial court determined that Defendant had four prior record points and should be sentenced as a Level II offender. Based upon these findings, the trial court entered a judgment sentencing Defendant to a minimum term of 170 months and a maximum term of 213 months imprisonment in the custody of the North Carolina Department of Correction. Defendant noted an appeal to this Court from the trial court's judgment.

### II Legal Analysis

On appeal, Defendant argues that the trial court erred by refusing to instruct the jury that it was entitled to return a verdict convicting Defendant of the lesser-included offense of involuntary manslaughter.[2] Due to the fact that the evidence, when taken in the light most favorable to Defendant, would have reasonably supported a jury verdict convicting Defendant of involuntary manslaughter, we conclude that Defendant's argument has merit.

This Court reviews a defendant's challenge to a trial court's decision to instruct the jury on the issue of the defendant's guilt of a

---

2. At the jury instruction conference, Defendant requested that the trial court instruct the jury concerning the issue of Defendant's guilt of involuntary manslaughter. The trial court denied Defendant's request. At the conclusion of the trial court's instructions, Defendant unsuccessfully renewed his request for an involuntary manslaughter instruction. As a result, we conclude that Defendant adequately preserved this issue for appellate review. N.C.R. App. P. 10(a)(2) (stating that "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection[.]")

lesser included offense, such as involuntary manslaughter, on a *de novo* basis. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009) (stating that "[a]ssignments of error challenging the trial court's decisions regarding jury instructions are reviewed de novo") (citing *State v. Ligon*, 332 N.C. 224, 241-42, 420 S.E.2d 136, 146-47 (1992) and *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 434 (1990)). "[A] judge presiding over a jury trial must instruct the jury as to a lesser included offense of the crime charged where there is evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense." *State v. McConnaughey*, 66 N.C. App. 92, 95, 311 S.E.2d 26, 28 (1984) (citing *State v. Wallace*, 309 N.C. 141, 145, 305 S.E.2d 548, 551 (1983) and *State v. Redfern*, 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976), *disapproved on other grounds by State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993)). In determining whether the evidence is sufficient to support the submission of the issue of a defendant's guilt of a lesser included offense to the jury, "courts must consider the evidence in the light most favorable to [the] defendant." *State v. Clegg*, 142 N.C. App. 35, 46, 542 S.E.2d 269, 277 (quoting *State v. Mash*, 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988)), *disc. review denied*, 353 N.C. 453, 548 S.E.2d 529 (2001). However, "[i]f the State's evidence is sufficient to fully satisfy its burden of proving each element of the greater offense and there is no evidence to negate those elements other than defendant's denial that he committed the offense, defendant is not entitled to an instruction on the lesser offense." *State v. Smith*, 351 N.C. 251, 267-68, 524 S.E.2d 28, 40 (citation omitted), *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100, 121 S. Ct. 151 (2000).

The evidence, when taken in the light most favorable to Defendant, tended to show that Defendant did not intend to kill or seriously injure Mr. Lien; that Mr. Lien became angry at Defendant after Defendant offered drugs to his girlfriend, Ms. Carfaro; that, after an initial incident during which Mr. Lien either punched or shoved Defendant, others separated the two men; that Mr. Lien subsequently charged Defendant, who struck Mr. Lien on the top of the head or the side of the neck with a beer bottle; that the beer bottle shattered on impact; that Defendant and Mr. Lien struggled and fell into the fire; and that Defendant did not stab Mr. Lien. As a result of the fact that the undisputed evidence establishes that Mr. Lien's death resulted from a large laceration to the neck, the evidence, taken in the light most favorable to Defendant, might reasonably be understood as tending to suggest that the fatal wound was unintentionally inflicted either at the time that the bottle shattered or when Defendant and Mr.

Lien were rolling around on the ground rather than as the result of a decision by Defendant to deliberately stab Mr. Lien with the broken bottle.[3] We believe that this evidence, considered in the light most favorable to Defendant, would permit a reasonable juror to find Defendant guilty of involuntary manslaughter.

Involuntary manslaughter, which is "a lesser included offense of second degree murder[,]" *State v. Thomas*, 325 N.C. 583, 591, 386 S.E.2d 555, 559 (1989, is the "unlawful killing of a human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury.' " *State v. Drew*, 162 N.C. App. 482, 685, 592 S.E.2d 27, 29 (quoting *State v. Powell*, 336 N.C. 762, 767, 446 S.E.2d 26, 29 (1994) (citation omitted)), *disc. review denied*, 358 N.C. 735, 601 S.E.2d 867 (2004). The offense "may also be defined as the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life,. or (2) a culpably negligent act or omission." *Powell*, 335 N.C. at 767, 446 S.E.2d at 29. "Involuntary manslaughter is distinguished from murder . . . by 'the absence of malice, premeditation, deliberation, intent to kill, and intent to inflict serious bodily injury.' " *Drew*, 162 N.C. App. at 686, 592 S.E.2d at 29 (quoting *State v. Greene*, 314 N.C. 649, 651, 336 S.E.2d 87, 89 (1985)).

As used in the criminal law, "culpable negligence . . . requires more than the negligence necessary to sustain a recovery in tort . . . [and] must be such reckless or careless behavior that the act imports a thoughtless disregard of the consequences of the act or the act shows a heedless indifference to the rights and safety of others." *State v. Everhart*, 291 N.C. 700, 702, 231 S.E.2d 604, 606 (1977). An involuntary manslaughter conviction can be based upon evidence tending to show the occurrence of an "unintentional homicide resulting from the reckless use of a deadly weapon under circumstances not evidencing a heart devoid of a sense of social duty." *State v. Fleming*, 296 N.C. 559, 564, 251 S.E.2d 430, 433 (1979). "[W]hile involuntary manslaughter imports an unintentional killing, i.e., the absence of a

---

3. In the interest of simplicity, we will assume, for the remainder of this opinion, that Mr. Lien's death resulted from a stab wound inflicted at the time that Defendant hit him in the head with the bottle. In the event that the jury concluded that the fatal wound occurred when Defendant and Mr. Lien were rolling around on the ground, such a determination might also support an involuntary manslaughter conviction. However, we need not examine that issue in detail, given that the evidence tending to suggest that the fatal wound was inflicted when Defendant struck Mr. Lien in the head with the bottle provides ample basis for the submission of the issue of Defendant's guilt of involuntary manslaughter to the jury.

specific intent to kill, it is . . . accomplished by means of some intentional act[,]" since, "without some intentional act in the chain of causation leading to death[,] there can be no criminal responsibility[,]" so that "[d]eath under such circumstances would be the result of accident or misadventure." *State v. Wilkerson*, 295 N.C. 559, 582, 247 S.E.2d 905, 918 (1978) (citations omitted); *see also State v. Brewer*, 325 N.C. 550, 575-76, 386 S.E.2d 569, 583-84 (1989), (stating that a lack of evidence of an unintentional shooting is not determinative on the question of whether or not the trial court erred by failing to submit the issue of the defendant's guilt of involuntary manslaughter to the jury), *cert. denied*, 495 U.S. 951, 109 L. Ed. 2d 541, 110 S. Ct. 2215 (1990).[4] As a result, despite the fact that Defendant acted intentionally at the time that he struck Mr. Lien with the bottle, the evidence contained in the present record is susceptible to the interpretation that, at the time that he struck Mr. Lien, Defendant did not know and had no reason to believe that the bottle would break or that the breaking of the bottle would inflict a fatal wound to Mr. Lien's neck. Death resulting from such a series of events would, under the previous decisions of this Court and the Supreme Court, permit an involuntary manslaughter conviction.

A series of decisions by this Court and the Supreme Court have clearly stated that, in similar situations, the record evidence supported the submission of the issue of the defendant's guilt of involuntary manslaughter to the jury. For example, the Supreme Court has held that a trial court erred by refusing to deliver an involuntary manslaughter instruction because "defendant's evidence, if believed, could support a verdict of involuntary manslaughter on the theory that the killing was the result of his reckless, but unintentional use of the butcher knife[,]" when he intentionally carried and used such a knife during the course of a struggle with the deceased, but claimed that "the actual infliction of the fatal wound . . . was not intentional." *State v. Buck*, 310 N.C. 602, 606-07, 313 S.E.2d 550, 553 (1984). Similarly, the Supreme Court has held that the record supported the submission of an involuntary manslaughter issue to the jury on the basis of the defendant's testimony that he picked up a knife on impulse and accidentally pushed the knife into the deceased during a struggle. *Fleming*, 296 N.C. at 563-64, 251 S.E.2d at 432-33. In explaining this determination, the Supreme Court stated that:

---

4. For this reason, the State's reliance upon Defendant's admission that he intentionally hit Mr. Lien with the bottle is not sufficient, standing alone, to support upholding the trial court's refusal to submit an involuntary manslaughter issue to the jury.

[Defendant] says the cutting was not intentional. If believed, his testimony would support a finding of . . . an unintentional homicide resulting from the reckless use of a deadly weapon under circumstances not evidencing a heart devoid of a sense of social duty. In the setting created by such testimony, *and with credibility a matter for the jury*, it was not error for the court to submit involuntary manslaughter with appropriate instructions[.]

*Id.* This Court addressed a similar issue in *Drew*, where we reasoned that:

In *State v. Daniels*, 87 N.C. App. 287, 360 S.E.2d 470 (1987), as here, the defendant argued that the trial court erred in submitting involuntary manslaughter as a possible verdict when the defendant had stabbed the victim. In *Daniels*, the defendant, who was in a fight with the victim, "stuck at him, trying to get him away from [her]", but "she did not intend to either stab or hurt [the victim.]" The Court also observed that the defendant had claimed, in her statements, that she did not mean to hurt the victim. This Court held that "[e]vidence indicating that [the victim's] death was caused by defendant inadvertently stabbing him in the chest while not attempting or intending to do so clearly meets [the] requirement" that the killing was the result of an act done in a culpable or criminally negligent way.

The evidence in this case is comparable. There were no eyewitnesses to the actual stabbing; the sole evidence of what occurred in the bathroom is found in defendant's statements to the Sheriff's Department. From those statements, a jury could find that defendant, who had been told that no one was in the house, was surprised in the bathroom by a man whom he did not immediately recognize; that the intruder lunged or swung at him; that he immediately swung back holding the knife; and that he ran away out of fear. The jury could also find, based on defendant's statements and the testimony of the officers, that defendant did not know that he had stabbed [the victim] and that he did not intend to kill him. Officers confirmed that defendant was "hysterical" and "very upset" when they found him.

From this evidence, the jury could have further concluded that defendant panicked after discovering [the victim] and either (1) intended to strike at [the victim] to keep him away, but did not intend to kill or seriously injure him; or (2) simply reacted instinctively without any intent to strike [the victim] at all. Either

scenario would support a verdict of involuntary manslaughter under *Daniels*.

*Drew*, 162 N.C. App. at 686-87, 592 S.E.2d at 30 (internal citations omitted). Taken together, *Buck*, *Fleming*, *Drew*, and *Daniels* clearly establish that evidence tending to show the occurrence of a killing caused by the negligent or reckless use of a deadly weapon without any intent to inflict death or serious injury is sufficient to support an involuntary manslaughter conviction. *Drew*, 162 N.C. App. at 686, 592 S.E.2d at 29 (stating that, "[a]lthough the crime in this case involved a deadly weapon—a knife—defendant may still be found guilty of involuntary manslaughter if he acted without any intent to kill or inflict serious injury"); *Daniels*, 87 N.C. App. at 289, 360 S.E.2d at 471 (stating that "[e]vidence indicating that [the deceased's] death was caused by defendant inadvertently stabbing him in the chest while not attempting or intending to do so" suffices to support a finding that the defendant is guilty of involuntary manslaughter); *State v. Graham*, 38 N.C. App. 86, 89, 247 S.E.2d 300, 302-03 (1978) (stating that the defendant's testimony to the effect that "[h]e fired two shots, the first aimed at no one but intended to break up a fight, and the second, accidentally when 'he throwed up the gun and it went off,' " described an unintentional killing and required the submission of the issue of the defendant's guilt of involuntary manslaughter to the jury). Although Defendant admitted that he intended to hit Mr. Lien with an intact beer bottle in his trial testimony, he denied that he intended to kill or seriously injury him. Such evidence, if believed is, under *Buck*, *Fleming*, *Drew*, and *Daniels*, sufficient to support a finding that Mr. Lien's death resulted from the Defendant's reckless use of the bottle and would support a jury verdict finding Defendant guilty of involuntary manslaughter.

The facts at issue here are easily distinguishable from those held insufficient to support the submission of an involuntary manslaughter instruction. In such cases, "the evidence show[ed] that the defendants deliberately engaged in an act likely to result in death or serious injury [and,] [o]ther than the defendants' assertions that they had not meant to kill, there was no evidence that the killings were accidental." *McConnaughey*, 66 N.C. App. at 97, 311 S.E.2d at 30; *see also State v. Fisher*, 318 N.C. 512, 525-26, 350 S.E.2d 334, 342 (1986) (holding that the evidence did not support the submission of the issue of the defendant's guilt of involuntary manslaughter to the jury when "the defendant admit[ted] that he knowingly slashed and stabbed the deceased with a hunting knife[,]" since "[t]here can be no claim of accidental injury where one knowingly and willingly uses a knife to slash and

stab his victim" and since "[f]atal consequences were not improbable in light of the defendant's use of his hunting knife in such a manner"); *State v. Young*, 196 N.C. App. 691, 698, 675 S.E.2d 704, 709 (2009) (holding that the submission of the issue of Defendant's guilt of involuntary manslaughter to the jury was not required where "the evidence presented at trial, taken in the light most favorable to the Defendant, indicates that either Defendant intentionally fired the shot that killed the victim or Defendant aided and abetted the commission of an intentional crime"). Here, however, the record contains evidence other than a mere claim of lack of intent tending to support Defendant's contention that he did not intend to kill or seriously injure Mr. Lien, such as the evidence tending to show that Defendant struck Mr. Lien with the bottle when Mr. Lien rushed at him, that Defendant only struck Mr. Lien with the bottle on one occasion, and that Defendant did not, contrary to testimony presented by certain of the State's witnesses, stab Mr. Lien with the broken beer bottle during the resulting melee. As a result, the evidence tending to support a conclusion that a reasonable jury could convict Defendant of involuntary manslaughter consists of much more than Defendant's unsupported claim that he did not intend to kill or seriously injure Mr. Lien.

In attempting to defend the trial court's refusal to submit an involuntary manslaughter issue to the jury, the State relies on Defendant's admission that he intentionally hit Mr. Lien on the head with a beer bottle. As a result of its belief that the beer bottle in question was a deadly weapon as a matter of law, the State argues that Defendant is presumed, under well-established North Carolina law, to have acted with malice, thereby validating the trial court's refusal to allow the jury to consider the issue of Defendant's guilt of involuntary manslaughter. We do not find this argument persuasive.

Although the State is certainly correct in noting that "[t]he intentional use of a deadly weapon [creates] a presumption . . . [of] malice[,]" *State v. Judge*, 308 N.C. 658, 661, 303 S.E.2d 817, 820 (1983) (citation omitted), the rule "that the law implies malice and unlawfulness from the intentional use of a deadly weapon proximately resulting in death is not a conclusive, irrebuttable presumption," so that, if the defendant adduces evidence or relies on a portion of the State's evidence "raising an issue on the existence of malice and unlawfulness," the presumption "disappears altogether, leaving only a permissible inference which the jury may accept or reject." *State v. Reynolds*, 307 N.C. 184, 190, 297 S.E.2d 532, 535-36 (1982) (citing *State v. Hankerson*, 288 N.C. 632, 649-52, 220 S.E.2d 575, 588-89 (1975), *rev'd on other*

*grounds*, 432 U.S. 233, 53 L. Ed. 2d 306, 97 S. Ct. 2339 (1977), *State v. Brock*, 305 N.C. 532, 543-44, 290 S.E.2d 566, 573-74 (1982), *disapproved on other grounds by State v. Taylor*, 337 N.C. 597, 612-13, 447 S.E.2d 360, 370 (1994), *State v. Simpson*, 303 N.C. 439, 451, 279 S.E.2d 542, 550 (1981), *State v. Biggs*, 292 N.C. 328, 340, 233 S.E.2d 512, 518-19 (1977)). As a result, assuming, without in any way deciding, that the trial court was correct in instructing the jury that the beer bottle was a deadly weapon as a matter of law, *State v. Morgan*, 156 N.C. App. 523, 529-30, 577 S.E.2d 380, 385-86 (holding that the trial court did not err by instructing the jury in a felonious assault case that an Arbor Mist wine bottle, with which the defendant hit the victim in the head, was a deadly weapon as a matter of law), *disc. review denied*, 357 N.C. 254, 583 S.E.2d 43 (2003), Defendant's evidence concerning the reason for which, manner in which, and circumstances under which he used that bottle at the time of his altercation with Mr. Lien sufficed to convert the presumption upon which the States relies from a mandatory presumption to a permissible inference. *Reynolds*, 307 N.C. at 190, 297 S.E.2d at 536. As a result, the State's reliance on the presumption of malice arising from the intentional infliction of a wound with a deadly weapon does not, given the facts of this case, provide adequate support for the trial court's refusal to submit the issue of Defendant's guilt of involuntary manslaughter to the jury.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court erred by refusing Defendant's request for the submission of the issue of his guilt of the lesser included offense of involuntary manslaughter to the jury. Had the jury been permitted to consider the issue of Defendant's guilt of involuntary manslaughter, there is a reasonable possibility that it might have concluded that he acted "without intention to kill or inflict serious bodily injury, and without either express or implied malice," making him guilty of involuntary manslaughter rather than second degree murder. *State v. Foust*, 258 N.C. 453, 459, 128 S.E.2d 889, 893 (1963) (citations omitted). "In this setting, and with credibility a matter for the jury, the court should have submitted involuntary manslaughter with appropriate instructions" to the jury. *State v. Wrenn*, 279 N.C. 676, 683, 185 S.E.2d 129, 133 (1971). As a result, Defendant is entitled to a new trial.

NEW TRIAL.

Judges ROBERT C. HUNTER and ROBERT N. HUNTER, JR. concur.