*588 HUNTER, Robert C., Judge,
dissenting.
Based on decisions by this Court and our Supreme Court and taking the evidence in the light most favorable to defendant, I believe the evidence would permit a reasonable jury to find defendant guilty of involuntary manslaughter. Consequently, I would conclude that the trial court committed reversible error in failing to charge the jury on involuntary manslaughter and that defendant is entitled to a new trial.
Background
On 6 May 2011, Adrian Epps (“defendant”) and his girlfriend, Jamie Vittatoe (“Ms. Vittatoe”), decided to have a small get-together at their home near the town of Stanley, North Carolina. They invited defendant’s cousin Anitra Adams (“Ms. Adams”) who invited her boyfriend of two months Antwan Rashard McGill (“Mr. McGill”). After Ms. Adams and Mr. McGill arrived, around 8 or 9 that night, Ms. Adams asked if defendant had any orange juice to mix with vodka. Defendant replied that they did not; instead, he cut up lime wedges for her to squeeze into her drinks. Over the course of the evening, the couples drank alcohol and smoked marijuana. While no one was able to definitively establish how much the parties drank, several of the witnesses testified that both defendant and Mr. McGill were quite intoxicated. In fact, one witness testified that defendant was so intoxicated that he was “stumbling” around and fell down twice. Moreover, several witnesses claimed that Mr. McGill got sick in the bathroom from consuming too much alcohol. According to the postmortem toxicology report, Mr. McGill had a blood alcohol level of .16 and a small amount of Xanax in his system.
At some point during the evening, defendant and Mr. McGill began arguing; the witnesses provided contradictory accounts of the altercation. Defendant contended that the argument started when Mr. McGill made a derogatory comment about Ms. Vittatoe. Defendant and Mr. McGill went outside where a physical fight ensued. Defendant claimed that Mr. McGill pulled his legs out from under him and beat him so severely that defendant passed out twice. When defendant woke up the first time during the fight, he felt “dizzy.” At this point, while defendant was still on the ground, Mr. McGill kicked him in the face, and defendant stated that it felt like his face “exploded” and his ears began ringing. When he woke up the second time, defendant alleged that he saw Ms. Adams and Mr. McGill sitting in Ms. Adams’s car in the driveway. Defendant went back inside his house through a screen door located off a side porch. Defendant stated that he was in severe pain, his head was “killing” him, he felt lightheaded, and his vision was blurry. Defendant *589 left the outside door propped open because he believed Mr. McGill and Ms. Adams were leaving. When he entered the kitchen, defendant and Ms. Vittatoe began cleaning the blood out of his mouth. Defendant heard footsteps outside on his driveway. He turned and saw Mr. McGill coming toward the screen door. Fearing that Mr. McGill was coming back to hurt him further or to harm Ms. Vittatoe, defendant ran to the screen door and held it shut. During the struggle, defendant claimed he heard Ms. Adams yell something about a gun. At this point, defendant grabbed the knife he had used earlier to cut limes, turned, and stabbed once through the closed screen door. Defendant testified that he “wasn’t trying to pay attention to exactly where [he] might hit [Mr. McGill] at, or how hard [he] might’ve swung the knife, or anything like that.” Defendant went on to allege:
I wasn’t trying to gauge I’m going to hit [Mr. McGill] here with [the knife], I’m going to hit him there with it, I’m going to use this much force, I’m not going to use that much force, I’m going to pull back at this moment of that moment. None of that was going through my head. Only thing was going through my head was I need to protect myself. I was in fear for my life that it was going to either be my life or his life.
Ms. Adams and Devan Williams, a friend of Mr. McGill’s, took Mr. McGill to the hospital where he was pronounced dead in the emergency room. According to the pathologist who performed the autopsy, Mr. McGill died as a result of excessive bleeding from a single stab wound in his upper chest.
At trial, defendant requested the trial court instruct on involuntary manslaughter. However, the trial court denied his request because involuntary manslaughter did not “apply” and noted defendant’s objection for purposes of an appeal. The jury was instructed on first-degree murder, second-degree murder, voluntary manslaughter, and the defenses of self-defense and defense of habitation. The jury found defendant guilty of voluntary manslaughter. The trial court sentenced defendant to a minimum of 121 months to a maximum of 155 months imprisonment. Defendant appealed.
Argument
Defendant’s sole argument on appeal is that the trial court committed reversible error by refusing to instruct the jury on involuntary manslaughter. Specifically, defendant contends that although there was contradictory evidence presented at trial, there was sufficient evidence *590 presented to permit the jury to find him guilty of involuntary manslaughter. Taking the evidence in a light most favorable to defendant, I agree.
“[Arguments] challenging the trial court’s decisions regarding jury instructions are reviewed de novo by this Court.” State v. Osorio, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). “An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater.” State v. Millsaps, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002). “In determining whether the evidence is sufficient to support the submission of the issue of a defendant’s guilt of a lesser included offense to the jury, courts must consider the evidence in the fight most favorable to the defendant.” State v. Debiase, 211 N.C. App. 497, 504, 711 S.E.2d 436, 441 (internal quotation marks omitted), disc. review denied, 365 N.C. 335, 717 S.E.2d 399 (2011). Our Supreme Court has noted that “[c]onflicts in the evidence are for the jury to resolve, not this Court” when deciding whether the trial court erred in not submitting an instruction on involuntary manslaughter. State v. Lytton, 319 N.C. 422, 427, 355 S.E.2d 485, 488 (1987). “It is reversible error for the trial court to fail to instruct on a lesser offense when evidence has been introduced which supports the finding of such a lesser offense.” State v. Fisher, 318 N.C. 512, 524, 350 S.E.2d 334, 341 (1986).
Involuntary manslaughter is a lesser included offense of second-degree murder and voluntary manslaughter. State v. Thomas, 325 N.C. 583, 591, 386 S.E.2d 555, 559 (1989). Unlike voluntary manslaughter which requires that a defendant have an intent to kill, see State v. Wilkerson, 295 N.C. 559, 579, 247 S.E.2d 905, 916 (1978), “involuntary manslaughter can be committed by the wanton and reckless use of a deadly weapon such as a firearm [see State v. Wallace, 309 N.C. 141, 305 S.E.2d 548 (1983)] or a knife [see State v. Fleming, 296 N.C. 559, 251 S.E.2d 430 (1979)][,]” State v. Buck, 310 N.C. 602, 605, 313 S.E.2d 550, 552 (1984).
Here, the evidence, when taken in the fight most favorable to defendant, could support a verdict of involuntary manslaughter based on the theory that defendant killed Mr. McGill as a result of his reckless use of the knife. At trial, defendant’s own testimony establishes that he was not trying to intentionally inflict a fatal wound; specifically, defendant testified that he was not aiming at any particular area on Mr. McGill’s body or consciously using any specific amount of force. Instead, his testimony indicates that he was acting instinctively and reflexively when he grabbed the knife, tinned, and made a single stabbing motion toward Mr. McGill through a closed screen door. While it is uncontroverted that *591 defendant intentionally used the knife, our Supreme Court has made it clear that the element of intent for purposes of manslaughter is whether the defendant intended to inflict a fatal wound, not whether the use of the weapon was intentional. See Buck, 310 N.C. at 607, 313 S.E.2d at 553 (concluding that the trial court erred in not submitting the involuntary manslaughter instruction when “[the] defendant was wielding the butcher knife generally to defend against a felonious assault upon him, [but] the actual infliction of the fatal wound, according to [the] defendant, was not intentional”). While the testimony of other witnesses contradicts defendant’s testimony concerning his lack of intent to kill Mr. McGill, their testimony does not matter because the trial court must consider the evidence in a light most favorable to defendant. Thus, the conflict in the evidence was for the jury to resolve, not the trial court by refusing to submit the lesser included offense to the jury. Consequently, I believe that defendant’s own description of the events coupled with the fact that Mr. McGill was struck only once through a closed screen door during the altercation was enough to warrant the submission of the involuntary manslaughter instruction to the jury.
Unlike the majority, I believe the facts of this case are similar to those of Debíase. There, during an altercation, the defendant struck the victim with a beer bottle; although several of the witnesses claimed that the defendant struck him multiple times, defendant alleged to only have hit the victim once. Debíase, 211 N.C. App. at 499-501, 711 S.E.2d at 438-39. The victim died as a result of massive blood loss from a “gaping wound” on his neck. Id. at 498, 711 S.E.2d at 437-38. The victim also suffered a second, superficial wound on his head. Id. The pathologist who conducted the autopsy contended that both wounds could only have come from a broken beer bottle. Id. This suggested that the beer bottle broke at some point during the defendant’s altercation with the victim.
At trial, the court refused to give an instruction on involuntary manslaughter. This Court reversed, concluding that the evidence, when taken in the light most favorable to the defendant, had the tendency to show that the defendant did not intend to kill or seriously injure the victim. Id. at 504, 711 S.E,2d at 441. In order to reach its conclusion, the Court reviewed numerous decisions of both this Court and our Supreme Court noting, in pertinent part, that:
despite the fact that [the] [defendant acted intentionally at the time that he struck [the victim] with the bottle, the evidence contained in the present record is susceptible to the interpretation that, at the time that he struck [the victim], [the] [defendant did not know and had no reason to believe *592 that the bottle would break or that the breaking of the bottle would inflict a fatal wound to [the victim’s] neck.

Id.

Like Debíase, I believe that the evidence in the present case was sufficient to support a reasonable conclusion that Mr. McGill’s death resulted from defendant’s reckless use of the knife. It is uncontroverted that defendant and Mr. McGill had been engaged in a physical altercation which resulted after both had been consuming alcohol and drugs for several hours. Defendant’s own testimony suggests that he reacted instinctively when he believed Mr. McGill was coming to hurt either himself or Ms. Vittatoe. In his testimony, defendant claimed that he struck at Mr. McGill without any conscious effort to hit him in any particular way. Moreover, the way in which he wounded Mr. McGill supports his contention that he was acting unintentionally. During the struggle, defendant swung the knife only once through a closed screen door. As a result, I believe the evidence in the present case was “susceptible,” Debíase, 211 N.C. App. at 504, 711 S.E.2d at 441, to an interpretation that defendant did not intend to inflict a fatal wound when he swung once at Mr. McGill with the knife.
Moreover, I disagree with the majority’s conclusion that Debíase is distinguishable because: (1) the altercation between Mr. McGill and defendant was over by the time defendant stabbed Mr. McGill; and (2) defendant had not been holding the knife when the fight began but, instead, grabbed it from the table once they were struggling at the door. While the fight between defendant and Mr. McGill had momentarily ceased at the time defendant entered his kitchen and began cleaning his wounds, Mr. McGill resumed his attack by trying to come in defendant’s home. In addition, while the majority is correct that the Debíase defendant had the bottle in his hand prior to the altercation intensifying, id. at 499-502, 711 S.E.2d at 438-440, our Supreme Court has concluded that a defendant who grabs a weapon during the fight may still be entitled to the involuntary manslaughter instruction. See Buck, 310 N.C. at 603-604, 313 S.E.2d at 551-52 (holding that a defendant was entitled to an involuntary manslaughter jury instruction when the defendant’s testimony was that he “instinctively” grabbed a butcher knife off a table to scare the victim). Thus, as in Debíase, defendant produced sufficient evidence for a reasonable jury to find him guilty of involuntary manslaughter, and the trial court erred in not giving the instruction on it.
In so concluding, I am mindful of other cases in which our Courts have held that a defendant was not entitled to an instruction on *593 involuntary manslaughter when there was no evidence that the killing was unintentional other than the defendant’s own claim that he had not meant to kill and his actions were such that “[f]atal consequences were not improbable.” Fisher, 318 N.C. at 526,350 S.E.2d at 342. In Fisher, the defendant used a hunting knife dining a fight and testified that he used it to “indiscriminately cut[] and jab[]” the victim. Id. While the defendant contended he was entitled to an instruction on involuntary manslaughter because the victim’s death was accidental, this Court disagreed, noting that
In this case, the defendant admits that he knowingly slashed and stabbed the deceased with a hunting knife. The defendant’s use of a knife indicates a clear intent to inflict great bodily harm or death on the deceased. There can be no claim of accidental injury where one knowingly and willingly uses a knife to slash and stab his victim. Fatal consequences were not improbable in light of the defendant’s use of his hunting knife in such a manner. As such, the defendant’s actions would not fit within the definition of involuntary manslaughter and therefore the defendant would not qualify for such an instruction.
Id. at 525-26, 350 S.E.2d at 342.
Here, however, the manner in which defendant killed Mr. McGill, a single stabbing motion through a closed screen door during a struggle where both parties were intoxicated and defendant claimed to be “dizzy” and in severe pain, supports the theory that Mr. McGill’s death was unintentional. In other words, unlike Fisher where the defendant’s own actions conflicted with his claim that he did not intend to kill the victim, the manner in which defendant used the knife in the present case does not. Fatal consequences were not necessarily probable based on the manner in which defendant used the knife. Thus, I believe the facts at issue here are distinguishable from those cases because the record contains evidence other than defendant’s “mere claim of lack of intent,” Debiase, 211 N.C. App. at 509, 211 S.E.2d at 444, that supports defendant’s contention that he did not intend to kill or injure Mr. McGill in any particular way. Consequently, I believe defendant’s actions fit within the definition of involuntary manslaughter when the evidence is taken in the fight most favorable to defendant.
Conclusion
In summary, while acknowledging that there was contradictory evidence presented at trial, I must respectfully dissent from the majority *594 as I believe that the trial court erred in not submitting an instruction to the jury on involuntary manslaughter when taking the evidence in the light most favorable to defendant. Thus, I would hold that defendant is entitled to a new trial.