STATE OF NORTH CAROLINA v. STEVEN DOUGLAS REYNOLDS

No. 75A81

(Filed 7 December 1982)

1. **Homicide § 24.1— instructions concerning implied malice from intentional use of deadly weapon**

   Where the State offered evidence sufficient to permit a jury to find beyond a reasonable doubt that defendant intentionally used a deadly weapon, a pistol, to cause the death of the deceased, and there was no evidence in mitigation, the State proved murder in the second degree because malice and unlawfulness are implied in law. Therefore, an instruction to the jury that the law implies malice and unlawfulness from the intentional use of a deadly weapon proximately resulting in death was not a conclusive, irrebuttable presumption. Rather, the presumption was mandatory in that defendant, to avoid its effect, had the burden of producing some evidence raising an issue on the existence of malice and unlawfulness.

2. **Homicide § 15— admissibility of evidence of another crime to prove identity**

   In a prosecution for second degree murder, the trial court did not err in allowing evidence tending to show that defendant shot another person where the evidence tended to identify defendant as the perpetrator of the crime charged.

3. **Homicide § 15— evidence of arrest for "unrelated crime"—no objection by defendant—no error**

   Where in a prosecution for second degree murder, defendant made no objection to two references to defendant's arrest for a supposedly separate crime, his objection to the third reference came too late and was unaccompanied by a motion to strike. Further, it was clear the references had no effect on the outcome of the trial.

4. **Criminal Law § 96— erroneously admitted testimony cured by instruction**

   The trial court cured testimony which was erroneously admitted when it sustained defendant's objection and motion to strike and it instructed the jury to disregard the witness's statement.

5. **Criminal Law § 57— ballistics expert—testimony concerning similarities between bullets—admissible**

   In a homicide case in which an expert testified concerning similar rifling characteristics on bullets fired by defendant's gun and bullets taken from the deceased and another man, it was not error to permit the expert to state that he found nothing in his examinations to be inconsistent with the bullets taken from deceased and the other man having been fired from defendant's gun.

BEFORE *Rousseau, J.,* at the 26 January 1981 Criminal Session of GUILFORD Superior Court and a jury, defendant was tried and convicted of second degree murder. A sentence of life impris-

onment was imposed and defendant appealed as of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, for the state.*

*Adam Stein, Appellate Defender, by Ann B. Petersen, pro hac vice, for defendant appellant.*

EXUM, Justice.

The questions raised by this appeal are whether the trial court erred by: (1) instructing the jury on the implication of malice and unlawfulness from the use of a deadly weapon; (2) admitting evidence that defendant committed crimes other than the one for which he was tried; (3) admitting evidence of a prosecution witness's "feelings" about defendant; and (4) admitting ballistics evidence. We conclude no error warranting a new trial was committed.

Evidence presented by the state tended to show the following:

On 25 July 1980 at approximately 6 p.m., defendant arrived at Uncle Duke's Bar in Greensboro and began playing pool with the bartender, David Kirkman. Defendant told Kirkman that he had some marijuana hidden in the woods behind a trailer park on Interstate 85 and Holden Road and asked him if he knew anyone who would want to buy some of the drug at a cheap price. Kirkman indicated that he did not but would check.

A few minutes later, Daniel Morgan (the victim) and Lorraine Baysdon entered the bar accompanied by two others. Baysdon, who knew Kirkman, asked Kirkman if he knew where they could get some marijuana. Kirkman then spoke with defendant and defendant agreed to sell one-half pound of marijuana for $180. Defendant stipulated, however, that only one of the group could go with him and that person would have to drive. Morgan agreed to drive and left the bar to get his car. He returned to Uncle Duke's around 6:50 p.m. Morgan and defendant left the bar together around 7:10 p.m. Neither of them returned to Uncle Duke's that evening. One of Morgan's friends, Norbert Tarabec, however, saw and spoke with Morgan later that night. At the

time, Morgan was driving a 1966 turquoise Mustang. Tarabec testified that Morgan told him that he was going to buy some "herb," and that there was another person in the car with Morgan. Thereafter Morgan was never again seen alive. His body was found on 11 August 1980 in a wooded area near Interstate 85 and Holden Road. A forensic pathologist testified that the degree of decomposition of the body indicated that Morgan had been dead between ten days and six weeks. Witnesses observed defendant alone driving the 1966 turquoise Mustang on several occasions after he and Morgan left Uncle Duke's Bar. The first of these observations was in the late evening of 25 July and the last was on 30 July. On 31 July the car was seen by a state's witness at the bottom of a ravine near Wiley Davis Road, and was impounded by police on 2 August.

As further evidence connecting defendant with the murder of Morgan, the state offered testimony of Robert Stone and Barbara Stone about an assault on Mr. Stone by defendant. On 29 July 1980 around 8 p.m., defendant arrived at the Stones' home and was invited in. Robert Stone had met defendant on two or three previous occasions and knew him by the name of Steve Hayes. When he entered the Stones' house, defendant was wearing only a pair of jeans and had a blood-soaked bandage wrapped around his left hand. Defendant told Stone that he had been injured at work and needed a ride to his home in Level Cross. Stone gave defendant a shirt and agreed to drive. him home. On the way Stone asked defendant if he had any marijuana; defendant said he did not but suggested Stone might get some from a person living with defendant.

When they reached Level Cross, Stone parked the car beside the road. He and defendant then proceeded to walk across a wooded area to where defendant said his trailer was located. Approximately fifteen feet into the field, defendant pulled a gun from his pocket and shot Stone in the mouth. When he shot Stone, defendant said he was going to take his money and kill him. Stone threw his money, $1,410 he had for a deposit on a house, at defendant, then ran to a nearby house where an ambulance was called. In the ambulance, Stone spit out the bullet which was later analyzed and compared with the bullet taken from Morgan's head.

At the time of his arrest, defendant was in possession of a .25 caliber pistol and .25 caliber ammunition. This pistol and the ammunition, the bullets extracted respectively from Morgan's body and Stone's mouth, were submitted to the FBI for analysis. Microscopic comparisons revealed that the "rifling characteristics," *i.e.*, lands and grooves, on the test bullets fired from the .25 caliber pistol were the same as those on the bullets taken out of both Morgan and Stone. The ballistics expert was unable to state that the bullets taken from Morgan and Stone were definitely fired from the gun taken from defendant but, in his opinion, they could have been because there was nothing in their rifling characteristics inconsistent with their having been fired from that gun. Further, neutron activation analysis revealed that the bullets taken from Morgan and Stone and the ammunition found with defendant were of the same chemical composition, consistent with their having come from the same box of ammunition.

Defendant offered no evidence.

The trial judge instructed the jury, in part, as follows:

Now, as I have said, the defendant has been accused of second degree murder. Second degree murder is the unlawful killing of a human being with malice.

Now, I charge that for you to find the defendant guilty of second degree murder, the State of North Carolina must prove two things beyond a reasonable doubt:

First, that the defendant intentionally and with malice shot Daniel Bradley Morgan with a deadly weapon. Intent is the exercise of intelligent will. Intent is the condition or emotion of the mind which is seldom, if ever, capable of direct proof, but the intent of the person is usually deduced from the acts, declarations, and circumstances known to the person charged with having that intent. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom. Now, malice means not only hatred, ill will, or spite, as it is ordinarily understood to be, and to be sure that is malice, but it also means that condition of the mind which prompts a person to take the life of another in-

tentionally or to intentionally inflict a wound with a deadly weapon upon another which proximately results in his death without just cause, excuse, or justification. Now, a .25 caliber pistol is a deadly weapon.

Second, the State of North Carolina must prove and prove beyond a reasonable doubt that the shooting was the proximate cause of Daniel Bradley Morgan's death. A proximate cause is a real cause, a cause without which Morgan's death would not have occurred.

*Now, members of the jury, if the State of North Carolina proved beyond a reasonable doubt that the defendant intentionally killed Daniel Bradley Morgan with a deadly weapon or intentionally inflicted a wound upon Daniel Bradley Morgan with a deadly weapon that proximately caused his death, the law implies, first, that the killing was unlawful; and, second, that it was done with malice. If the killing was unlawful and was done with malice, the defendant would be guilty of second degree murder.* [Emphasis added.]

I.

[1] Defendant's first assignment of error is to the italicized portion of the trial judge's instructions set out above. Defendant argues that this instruction gives the state the benefit of a conclusive presumption of malice and unlawfulness upon proof by the state of the intentional infliction of a wound with a deadly weapon that proximately caused death. Defendant relies on *Sandstrom v. Montana*, 442 U.S. 510 (1979); *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978); and *Morissette v. United States*, 342 U.S. 246 (1952), for the proposition that conclusive presumptions violate the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Defendant fails to appreciate the difference between an unconstitutional conclusive presumption and a constitutionally permissible mandatory presumption. The difference between conclusive and mandatory presumptions has been stated as follows:

A presumption, or deductive device, is a legal mechanism that allows or requires the factfinder to assume the existence of a fact when proof of other facts is shown. The fact that

must be proved is called the basic fact; the fact that may or must be assumed upon proof of the basic fact is the presumed fact. A conclusive presumption provides that upon proof of the basic fact, the presumed fact must be found and cannot be overcome by rebutting evidence. If the deductive device provides that upon proof of the basic fact the presumed fact must be found but is subject to rebuttal, the device is commonly known as a mandatory presumption.

Schmolesky, *County Court of Ulster County v. Allen and Sandstrom v. Montana: The Supreme Court Lends an Ear but Turns Its Face,* 33 Rutgers L. Rev. 261, 265 (1981) (footnotes omitted). This Court noted the difference in *State v. White,* 300 N.C. 494, 507, 268 S.E. 2d 481, 489 (1980):

If the words of instruction describe an inference which must be drawn upon the proof of basic facts, then the presumption is *mandatory* in nature. Mandatory presumptions which conclusively prejudge the existence of an elemental issue or actually shift to defendant the burden to disprove the existence of an elemental fact violate the Due Process Clause. Mandatory presumptions which merely require defendant to come forward with *some evidence* (or take advantage of evidence already offered by the prosecution) to rebut the connection between the basic and elemental facts do not violate the Due Process Clause so long as in the presence of rebutting evidence (1) the mandatory presumption disappears, leaving only a mere permissive inference, and (2) the other requirements for permissive inferences described above are then met. Mandatory presumptions which require defendant to come forward with a quantum of evidence significantly greater than 'some evidence' may run afoul of due process by shifting the burden of persuasion to defendant. In the absence of *any* rebutting evidence, however, no issue is raised as to the nonexistence of the elemental facts and the jury may be directed to find the elemental facts if it finds the basic facts to exist beyond a reasonable doubt. [Emphasis original.]

The presumptions condemned in *Morissette* and *United States Gypsum Company* were conclusive, *i.e.,* irrebuttable. The Court in *Morissette* referred to a conclusive presumption as one

"which testimony could not overthrow." 342 U.S. at 275. In *United States Gypsum Company* the Court construed the presumption also as being irrebuttable. 438 U.S. at 446.

This Court in *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233 (1977), and subsequent cases, has consistently recognized that an instruction to the jury that the law implies malice and unlawfulness from the intentional use of a deadly weapon proximately resulting in death is not a conclusive, irrebuttable presumption. *See, e.g., State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566 (1982); *State v. Simpson*, 303 N.C. 439, 279 S.E. 2d 542 (1981); *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977). The presumption is mandatory in that defendant, to avoid its effect, must produce some evidence raising an issue on the existence of malice and unlawfulness or rely on such evidence as the state may have adduced. In the presence of evidence raising such issues, the presumption disappears altogether, leaving only a permissible inference which the jury may accept or reject. *State v. Hankerson, supra.*

> The effect of the presumption is to impose upon the defendant the burden of going forward with or producing some evidence of a lawful reason for the killing or an absence of malice; *i.e.*, that the killing was done in self-defense or in the heat of passion upon sudden provocation. The state is not required to prove malice and unlawfulness unless there is some evidence of their nonexistence, but once such evidence is presented, the state must prove these elements beyond a reasonable doubt.

*State v. Simpson, supra*, 303 N.C. at 451, 279 S.E. 2d at 550. And:

> If, after the mandatory presumptions are raised, there is no evidence of a heat of passion killing on sudden provocation and no evidence that the killing was in self-defense, *Mullaney* [*v. Wilbur*, 421 U.S. 684 (1975)] permits and our law requires the jury to be instructed that defendant must be convicted of murder in the second degree. If, on the other hand, there is evidence in the case of all the elements of heat of passion on sudden provocation the mandatory presumption of malice disappears but the logical inferences from the facts proved remain in the case to be weighed against this evidence.

*State v. Hankerson, supra,* 288 N.C. at 651, 220 S.E. 2d at 589. The mandatory presumption "is simply a way of stating our legal rule that in the absence of evidence of mitigating or justifying factors all killings accomplished through the intentional use of a deadly weapon are deemed to be malicious and unlawful." *State v. Hankerson, supra,* 288 N.C. at 650, 220 S.E. 2d at 588.

The reason is that in our law of homicide there are at least three kinds of malice. One connotes a positive concept of express hatred, ill-will or spite, sometimes called actual, express, or particular malice. *State v. Benson,* 183 N.C. 795, 111 S.E. 869 (1922), *overruled on other grounds in State v. Phillips,* 264 N.C. 508, 516, 142 S.E. 2d 337, 342 (1965). Another kind of malice arises when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief. *State v. Wilkerson,* 295 N.C. 559, 247 S.E. 2d 905 (1978). Both these kinds of malice would support a conviction of murder in the second degree. There is, however, a third kind of malice which is defined as nothing more than "that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." *State v. Foust,* 258 N.C. 453, 458, 128 S.E. 2d 889, 893 (1962) (quoting *State v. Benson, supra,* 183 N.C. 795, 111 S.E. 869). It is this third kind of malice which is proved as a matter of law when the state proves the intentional infliction of a wound with a deadly weapon which results in death and there is no evidence of mitigation, justification or excuse.

> The critical step in the conceptual evolution of malice is MacKally's Case [9 Co. Rep. 65b, 77 Eng. Rep. 828 (1611)]. That early 17th century decision, as reported and interpreted by Coke, stands for the principle that the prosecution need not prove the element of malice to convict of murder. The judges realized that malice does not lend itself to affirmative proof; by and large, the malicious killing is defined by reference to what it is not, not by what it is. As agreed by all, one type that was not malicious was a killing provoked by a sudden quarrel. Thus, to have a triable issue of malice, one had to have a triable claim that the defendant killed in the course of a sudden quarrel.

Fletcher, *Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases*, 77 Yale L.J. 880, 905 (1968). Similarly, all intentional killings are deemed, in law, to be unlawful in the absence of some evidence showing that the killing was excused or justified. *State v. Hankerson, supra.*

In the instant case the state offered evidence sufficient to permit a jury to find beyond a reasonable doubt that defendant intentionally used a deadly weapon, a pistol, to cause the death of the deceased. There is no evidence of mitigation which might reduce the crime to manslaughter nor is there any evidence which would justify or excuse the killing. Under these circumstances the state has proved murder in the second degree because malice and unlawfulness are implied in law. The trial judge properly instructed the jury accordingly. This assignment of error is overruled.

II.

Next defendant urges that the trial court erred in admitting evidence of other crimes committed by defendant.

[2]   He first challenges the evidence of his assault against Robert Stone. Defendant contends this evidence was inadmissible under the general rule "that in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense." *State v. McClain*, 240 N.C. 171, 173, 81 S.E. 2d 364, 365 (1954). The rule, however, is subject to a number of exceptions which are set out with clarity and fully supported by applicable authorities in *McClain*, the leading case on this evidentiary point. One of these exceptions is: "Where the accused is not definitely identified as the perpetrator of the crime charged and the circumstances tend to show that the crime charged and another offense were committed by the same person, evidence that the accused committed the other offense is admissible to identify him as the perpetrator of the crime charged." *State v. McClain, supra*, at 175, 81 S.E. 2d at 367.

Under this exception evidence of the Stone assault was properly admitted against defendant. The state's principal burden was to satisfy the jury beyond a reasonable doubt that defendant was in fact Morgan's murderer. The state offered evidence of a num-

ber of circumstances tending to identify, but not definitely, defendant as Morgan's murderer. There was evidence tending to show that both Morgan and Stone were shot by the same person. Thus it was permissible for the state to show defendant shot Stone, notwithstanding this evidence tended to prove defendant guilty of a crime other than the one for which he was being tried.

## III.

[3] Defendant next contends that certain references in the testimony to defendant's "arrest" for an "unrelated crime" were erroneously admitted. Deputy G. R. Brady of the Guilford County Sheriff's Department testified *without objection* that on 26 July 1980 he "arrested" defendant in the parking lot of the Americana Motor Lodge on I-85 near Greensboro. Defendant successfully objected to testimony the state sought to offer regarding a conversation between Deputy Brady and defendant. Jasper Gibson then testified for the state that he was a maintenance man at the Americana Motor Lodge on 26 July when defendant approached him to ask if he had a shovel. Gibson testified, *without objection*:

> I said yes I have several of them. I said what do you want with a shovel. He said that he wanted to go down the road and dig up some pot. He asked me to go with him. I said no but I would loan him a shovel. I would have loaned him the shovel but at that point the officer drove up and apprehended him. I'm not sure how much later it was but about an hour and a half or two hours later Mr. Reynolds came back. I asked him if he was in trouble. He said he got questioned about some sort of murder.

Thereafter Gibson testified that he had seen the gun the state contended was the murder weapon:

> I am not certain of the day or date that I saw him with it, but it was one or two weeks before he was arrested by the sheriff.

> MR. RAY: Objection.

> COURT: Overruled.

> EXCEPTION NO. 8

> I had the gun in my hand. Mr. Reynolds showed it to me. State's Exhibit is the same gun I saw with Mr. Reynolds.

State v. Reynolds

That same day I also saw him with some money. I was off duty sitting in a lounge chair and Mr. Reynolds jumped in the pool. He jumped in the pool with his money. He took the money and asked me to hold it for him. I started laying it out in the sun to dry but I didn't count it. I don't know how much was there.

Defendant made no objection to the first two references to defendant's arrest. His objection to the third reference came too late and was unaccompanied by a motion to strike. Defendant, therefore, cannot complain about the introduction of this evidence on appeal. *State v. Foddrell*, 291 N.C. 546, 231 S.E. 2d 618 (1977); *State v. Hankerson, supra,* 288 N.C. 632, 220 S.E. 2d 575; *State v. Battle*, 267 N.C. 513, 520, 148 S.E. 2d 599, 604 (1966).

Furthermore, we are satisfied these passing references to defendant's arrest, presumably for the purpose of questioning him about Morgan's murder, had no effect on the outcome of the trial. The jury was never clearly apprised of the purpose of the arrest. The only reference to the reason for the arrest was the witness Gibson's statement that after defendant returned from being apprehended, "[h]e said he got questioned about some sort of murder." This undoubtedly led the jury to believe the purpose of the arrest was for questioning defendant about the very murder for which he was being tried. It is clear that at trial defendant was concerned not about the fact of this arrest but about what conversation might have taken place between the arresting officer and defendant. The damaging aspects of Gibson's testimony had nothing to do with his references to defendant's arrest. The damaging aspects were the testimony as to defendant's desire for a shovel and defendant's possession of what the state contended was the murder weapon.

Finally in this same vein defendant contends it was error for one of the state's witnesses to testify that she had seen a photograph of defendant. When asked to describe the picture she had seen she said, "I guess it was a wanted picture, a wanted poster." Defendant immediately objected; the trial court sustained the objection and instructed the jury to "disregard what she guessed it was." We conclude the court's prompt sustaining of defendant's objection and instructing the jury to disregard the evidence adequately cured any error that might have occurred. *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541 (1970).

IV.

[4] Defendant next argues the testimony of one of the state's witnesses who observed defendant several days after Morgan's murder was erroneously admitted. The witness, Louise Stafford, a desk clerk at Howard Johnson's Motel, testified that she observed defendant driving the turquoise 1966 Mustang when he checked into the motel on 28 July 1980. The following colloquy occurred:

Q. Did you pay particular attention to him?

A. Yes.

MR. RAY: Objection.

COURT: Overruled.

Q. Why did you pay particular attention to him?

EXCEPTION NO. 9

MR. RAY: Object.

COURT: Overruled.

EXCEPTION NO. 10

A. I don't know. I was just nervous. I had a funny feeling when he came in.

EXCEPTION NO. 11

MR. RAY: Object and move to strike.

COURT: Sustained. Members of the jury, disregard her funny feeling.

Again, the court's ruling on defendant's motion to strike and its instruction to the jury cured any error that might have occurred. *State v. Perry, supra,* 276 N.C. 339, 172 S.E. 2d 541.

V.

[5] Neither was there error in the admission of the testimony of one of the firearms experts. After testifying at length that various similarities existed between bullets fired from the gun taken from defendant and bullets taken from Stone and Morgan, firearms identification specialist William Albrecht of the FBI was permitted to testify as follows:

Q. And notwithstanding that you were not able to because of the condition of the gun make an absolute final conclusion that these bullets were fired by these guns, state whether or not you formed an opinion satisfactory to yourself as to whether there was anything in your analysis that would be inconsistent with these two bullets, State's Exhibit 11 and State's Exhibit No. 15, having both been fired by State's Exhibit No. 2, the gun?

MR. RAY: Object.

COURT: Overruled.

EXCEPTION NO. 23

A. No, there is nothing inconsistent that I found.

Defendant argues this testimony is so speculative and so lacking in probative value as to be inadmissible. A similar argument was made and rejected with regard to similar testimony in *State v. Ward*, 300 N.C. 150, 266 S.E. 2d 581 (1980). In *Ward* we held that it was not error for a firearms expert to testify that the fatal bullet "could have been fired" from defendant's gun, notwithstanding the expert's concession that the bullet was too deformed to make a conclusive comparison. The expert testified: "This type of bullet can be discharged from this type of firearm due to the family that it is. In other words, it is a .22 caliber bullet. And in [defendant's pistol] the bullet can be chambered or discharged with a .22 caliber cartridge which holds a .22 caliber bullet." *Id.* at 153, 266 S.E. 2d at 583. This Court said, *id.* at 153-54, 266 S.E. 2d at 583-84:

Defendant contends that the expert's answer that the fatal bullet 'could have' been fired from defendant's gun amounted to no more than mere speculation and therefore was inadmissible under the rule in *Lockwood v. McCaskill,* 262 N.C. 663, 138 S.E. 2d 541 (1964). *Lockwood,* however, requires only that an expert's opinion that a particular cause 'might' or 'could' have produced a particular result be based upon a reasonable probability 'that the result is *capable* of proceeding from the particular cause as a scientific fact . . . .' 262 N.C. at 669, 138 S.E. 2d at 545. (Emphasis supplied.) Considered contextually, witness Cerwin's testi-

mony was to the effect that the fatal bullet, a .22 caliber slug, was *capable* of being discharged from defendant's .22 caliber pistol *or from any other .22 caliber weapon.* Although the witness could have been allowed to express a more positive opinion, if he had had one, as to the causal relationship between defendant's gun and the bullet removed from the deceased's body, *see State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712 (1974), *death sentence vacated,* 428 U.S. 905 (1976), there was no error in the admission of his testimony that the bullet 'could have' been fired from defendant's pistol. *State v. Tilley,* 292 N.C. 132, 232 S.E. 2d 433 (1977). That the testimony might have had little probative value goes to the question of its weight and sufficiency, not its admissibility. *See generally* 1 Stansbury's North Carolina Evidence § 137 n. 97 (Brandis rev. 1973 and 1979 Supplement).

If anything, the testimony in *Ward* was less probative than the testimony offered by the firearms expert in the instant case. Here, the expert testified to similar rifling characteristics on bullets fired by defendant's gun and bullets taken from the deceased and Stone. His testimony that he found nothing in his examinations to be inconsistent with the Stone and Morgan bullets having been fired from defendant's gun in our opinion has some, if limited, probative value. This is true because the expert also testified that: "We have had some cases out of the thousands of cases I have worked on where there would be an inconsistency. We have had some cases where we could say that the bullet was definitely not fired from the gun." The evidence was thus admissible. Its weight was for the jury.

For the reasons stated we conclude that defendant has had a fair trial free from reversible error.

No error.

Justices MITCHELL and MARTIN did not participate in the consideration or decision of this case.