IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-140

No. 41A22

Filed 16 December 2022

STATE OF NORTH CAROLINA

v.

MARK BRICHIKOV

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 281 N.C. App. 408, 2022-NCCOA-33, vacating a judgment entered on 11 December 2019 by Judge Rebecca W. Holt in Superior Court, Wake County, and holding that defendant was entitled to a new trial. Heard in the Supreme Court on 5 October 2022.

*Joshua H. Stein, Attorney General, by Marc X. Sneed, Special Deputy Attorney General, for the State-appellant.*

*M. Gordon Widenhouse, Jr. for defendant-appellee.*

MORGAN, Justice.

¶ 1 The appeal in this homicide case raises the sole issue of whether the trial court committed prejudicial error by declining to deliver defendant's requested jury instruction on involuntary manslaughter. We hold that the evidence, viewed in the light most favorable to defendant, was sufficient to require the trial court to submit defendant's requested instruction to the jury and that this error prejudiced defendant because there was a reasonable possibility that a different result would have been

reached if the jury had been so instructed. Accordingly, we affirm the decision of the Court of Appeals, vacating the trial court's judgment and granting defendant a new trial.

## I. Procedural and Factual Background

¶ 2        Defendant was indicted by a grand jury for the criminal offense of first-degree murder in connection with the death of his wife, Nadia Brichikov, following her death on 22 April 2018. Defendant pleaded not guilty. A jury trial was held beginning 2 December 2019 before the Honorable Rebecca W. Holt in Superior Court, Wake County. The State elicited evidence through the testimony of fifteen witnesses. Defendant did not testify on his own behalf but did call two witnesses to establish his defense.

¶ 3        The evidence presented at trial tended to show the following: On 21 April 2018, defendant arranged to meet his wife, Mrs. Brichikov, at the Knights Inn motel in Raleigh. The Knights Inn was known by local law enforcement as a bustling location for criminal activity and illicit drug use. Defendant and Mrs. Brichikov both suffered from extensive histories of drug addiction. Mrs. Brichikov had been a regular user of marijuana, powder cocaine, and crack cocaine since at least the 1990s. Over time, her addiction worsened, and her drug use became an "all the time thing." Although Mrs. Brichikov had tried to end her drug use after having a son with her first husband in 2007, she "just couldn't kick it." Mrs. Brichikov's mother also told detectives that her

daughter was addicted to heroin and frequently subject to arrest by law enforcement. Mrs. Brichikov and defendant first met at a session of Narcotics Anonymous or Alcoholics Anonymous. They were married in 2015 and continued to purchase and use drugs together afterward.

¶ 4      Defendant had just been released from the recovery and addiction treatment center known as The Healing Place, and Mrs. Brichikov was recovering from an opioid overdose that she had experienced on the previous day, when defendant arranged to rendezvous with his wife on 21 April 2018. Mrs. Brichikov's overdose required the administration of the medication Narcan to her by emergency medical personnel to revive her after a fall which had led to a significant wound to the back of her head which required staples to close. Mrs. Brichikov had also been recently arrested for possession of methamphetamines and was released from jail on 18 April 2018 after agreeing to act as a confidential police informant. Defendant and his wife exchanged text messages expressing their love for, and promising their fidelity to, one another leading up to their meeting on 21 April 2018. Defendant also urged his wife to avoid using drugs, as he would be "sad to lose" her. Despite promising her loyalty to defendant, however, Mrs. Brichikov had been residing with Clay Trott, a man who provided her with money, rides, and a place to stay in exchange for sexual favors, prior to and immediately following her 20 April 2018 overdose. At trial, Trott identified Mrs. Brichikov as his girlfriend.

On 21 April 2018, defendant and Mrs. Brichikov met in Room 241 at the Knights Inn in Raleigh. Mrs. Brichikov checked into the room at 1:57 p.m. and defendant arrived at the Knights Inn at or around 10:30 p.m. Between 11:14 p.m. and 11:17 p.m., Mrs. Brichikov sent text messages to a contact saved as "Knight1," stating that defendant was "acting stupid," calling defendant a "[s]tupid crackhead," and claiming that she had had to "kick him out of [her] room." Between 3:15 a.m. and 3:17 a.m., Mrs. Brichikov made outgoing cellular telephone calls to contacts saved in her telephone directory as "Royalty Royalty" and "Julio New" which lasted a little over a minute each.

Motel surveillance video footage showed defendant exiting Room 241 at approximately 1:13 a.m. on 22 April 2018, wearing an "orangeish-brown" hooded sweatshirt and white shorts, and walking toward a nearby Exxon gas station. Video footage from the gas station showed defendant purchasing alcohol there and then approaching the passenger side of a red truck in the parking lot. Detective Kelly Kinney, who reviewed the footage and testified about it at trial, opined that this interaction was an illegal drug transaction. Motel video footage then showed defendant reentering Room 241 at approximately 1:35 a.m. with a black plastic bag in his hand. Defendant exited the motel room again at 3:20 a.m. to go back toward the Exxon gas station, then returned and reentered Room 241 at 3:25 a.m.; the video footage showed Mrs. Brichikov standing at the motel room door and letting defendant

back into the room. Between 3:29 a.m. and 3:43 a.m., the same action occurred. Mrs. Brichikov exited the room to smoke a cigarette at 3:34 a.m. and reentered with defendant at 3:43 a.m.

¶ 7 No one left or entered Room 241 again until 4:09 a.m., at which point defendant exited the room for the last time, leaving the door open to reveal Mrs. Brichikov lying on the floor with her arm moving back and forth. Defendant walked upstairs to the next level of the motel and knocked on at least two different motel room doors without receiving a response. Defendant briefly entered Room 341—the room directly above Room 241—before going back downstairs, jumping over a wall, and walking toward the front of the motel and out of the sight of the camera. At this point, defendant was wearing a black long-sleeve shirt and green boxer shorts while carrying an orange-brown hooded sweatshirt with him. Defendant then took his employer's truck, along with two iPad electronic tablets and his employer's credit card, and left for Wilmington, North Carolina. Defendant was later arrested in Wilmington.

¶ 8 At or around 5:00 a.m. on 22 April 2018, law enforcement officers were dispatched to Room 241 at the Knights Inn motel. Officer Gregory Modetz, who testified at trial, responded to the dispatch and arrived to find Mrs. Brichikov lying in the doorway. Her face had been "badly beaten and bloodied"; her tank top and bra had been pulled up to her neck, exposing her chest and abdomen; and she did not appear to be breathing. Officer Modetz summoned members of the fire department to

determine if Mrs. Brichikov had a pulse; she did not. Law enforcement officers discovered a glass crack cocaine pipe and twenty-dollar bills in the room. Defendant's wallet containing his identification, permanent resident card, credit card, and Social Security card was recovered on the same table as the crack pipe. A motel ice bucket was found containing loose hypodermic needles, cotton balls, alcohol preparation pads, bandages, two unused Narcan nasal sprays, small metal bowls commonly used for mixing illegal drugs, and long rubber bands commonly used for injecting intravenous drugs. Two more long rubber bands were found in the motel room's trash can. No weapons were found inside the room.

¶ 9    Agent Tracy Tremlett of the City-County Bureau of Identification (CCBI) testified at trial that she had also examined the room for evidence. She noted the presence of alcohol and white powder residue which appeared to be cocaine. To Agent Tremlett, the scene portrayed a struggle: furniture including the bed, side table, and a sitting chair had been moved, and Mrs. Brichikov's body was "entwined" with a chair. The agent noted smears or wipe marks through the blood stains on the motel room's floor, indicating movement consistent with a struggle. Four of Mrs. Brichikov's teeth had been knocked out. A chemical reagent designed to interact with trace amounts of blood not visible to the naked eye indicated the presence of blood in and around the motel room's sink and on a motel towel and washcloth. CCBI recovered from Room 241 a pair of red-stained white Hype shorts with "MB" written on the

waistband and an orange hooded sweatshirt from the bushes outside of the room.

¶ 10    Defendant and the State both retained medical experts to testify. Dr. Craig Nelson, who performed Mrs. Brichikov's autopsy, testified on behalf of the State that the majority of blood on Mrs. Brichikov was on her face, appearing to have emanated from her nose and mouth. Dr. Nelson noted Mrs. Brichikov's stapled laceration of the head, stating that it was consistent with the injuries accompanying her opioid overdose on 20 April 2018. She had slight intracranial bleeding, which had not been found by the CT[1] scan performed on her after her prior overdose. Dr. Nelson also noted numerous blunt force injuries on Mrs. Brichikov's face, neck, torso, and extremities, including fractures of her nose, cheekbones, and jaw. She had lacerations and a massive hematoma on her face, blood inside of her nose and mouth, and numerous absent or broken teeth that had appeared to be in poor dental repair prior to her death. Blood was not found inside of her lungs, esophagus, or stomach. There were bite marks on her torso and numerous marks at various stages of healing on her right arm consistent with intravenous drug use. Her upper chest and abdomen had "dirt-soiled adhesive" residue indicating a recent removal of electrocardiogram pads.

¶ 11    Dr. Nelson's autopsy also revealed atherosclerosis of Mrs. Brichikov's heart, including a narrowing of the middle portion of one of the major arteries of her heart by 80%. Dr. Nelson testified that a narrowing of 75% or more is associated with

---

[1] "CT" is an abbreviated reference for the term "computerized tomography."

sudden death. He opined that this condition was at least a "component of her death" since "the combination of a hard-working heart in a struggle, as well as that narrow coronary artery, is a setup for the heart to have a sudden irregular beat and stop." Additionally, Mrs. Brichikov's toxicology report revealed the presence of both cocaine and fentanyl, as well as the cocaine metabolites cocaethylene and benzoylecgonine, within her system. Dr. Nelson recognized that this likely played a role in her death as well. The doctor concluded that the totality of the drug use, Mrs. Brichikov's heart disease, and defendant's assault resulted in her death. He was unable to conclude whether she would have died in the absence of any one of these factors.

¶ 12     Dr. Jonathan Privette testified on behalf of defendant, opining that the "most suitable explanation for [Mrs. Brichikov's] immediate cause of death was the drugs that she had in her system, the fentanyl and the cocaine." Dr. Privette testified that, in his experience, Mrs. Brichikov would have survived the facial injuries inflicted by defendant if she had not had fentanyl in her system. Dr. Privette also testified that Mrs. Brichikov's movements on the floor when defendant exited Room 241 for the last time were consistent with a fentanyl overdose, but he could not exclude the possibility that she had suffered a heart attack since such an event could have been triggered by either Mrs. Brichikov's drug use or defendant's assault and would be difficult to detect postmortem. He also concluded that the superficial bruises and contusions on Mrs. Brichikov's neck were consistent with her practice of injecting drugs in that

region of her body.

¶ 13        The State called Dr. Dana Copeland to testify in rebuttal. Dr. Copeland agreed with Dr. Nelson that the proximate cause of Mrs. Brichikov's death was blunt force trauma, not drug toxicity; specifically, Dr. Copeland concluded that Mrs. Brichikov died from a trauma-induced heart attack, to which the presence of cocaine and fentanyl in her system as well as her head injury significantly contributed. Dr. Copeland disagreed with Dr. Privette that Mrs. Brichikov's final movements were consistent with an opioid overdose. Finally, Dr. Copeland testified that the bruising on Mrs. Brichikov's neck was consistent with an effort to strangle her and attributed greater significance to her above-average brain weight than either Drs. Nelson or Privette, while concluding that she had suffered a substantial enough intracranial injury from the assault to contribute to her confusion or a likely concussion. All three doctors agreed that, in their experience, the levels of fentanyl and cocaine in Mrs. Brichikov's system were capable of causing death in at least some drug users.

¶ 14        During the jury charge conference after both sides had concluded their respective case presentations, defendant conceded to his assault of Mrs. Brichikov and gave permission to his attorney to admit the assault during closing arguments. However, defense counsel requested that the trial court issue jury instructions on voluntary and involuntary manslaughter. Specifically, defense counsel requested an instruction on involuntary manslaughter under a theory of negligent omission—that

Mrs. Brichikov may have died as a result of defendant's negligent failure to render or obtain medical aid for her overdose. After the trial court went through the instruction for second-degree murder with the parties, the trial court verified with defense counsel:

> THE COURT: All right. So this [instruction] does include at the end of the second-degree, "If you do not find the defendant guilty of second-degree murder, you must determine whether the defendant is guilty of involuntary manslaughter," and . . . "First that the defendant acted in a criminally negligent way" is what you're requesting?
>
> [DEFENSE COUNSEL]: Yes, Your Honor.

The North Carolina Pattern Jury Instruction for "Second Degree Murder Where a Deadly Weapon Is Used, Not Including Self-Defense, Covering All Lesser Included Homicide Offenses" contains the following instruction on involuntary manslaughter as a lesser-included offense of second-degree murder:

> Involuntary manslaughter is the unintentional killing of a human being by an unlawful act not amounting to a felony, or by an act done in a criminally negligent way.
>
> For you to find the defendant guilty of involuntary manslaughter, the State must prove two things beyond a reasonable doubt:
>
> First, that the defendant acted a) [unlawfully] (or) b) [in a criminally negligent way]. a) [The defendant's act was unlawful if (*define crime e.g. defendant recklessly discharged a gun, killing the victim*).] b) [Criminal negligence is more than mere carelessness. The defendant's act was criminally negligent, if, judging by reasonable foresight, it was done with such gross

> recklessness or carelessness as to amount to a heedless
> indifference to the safety and rights of others.]
>
> And Second, the defendant's [unlawful] (or)
> [criminally negligent] act proximately caused the victim's
> death.

N.C.P.I.—Crim. 206.30A (2019) (alterations in original).

¶ 16     The trial court instructed the jury on the crimes of first-degree murder and second-degree murder, as well as the possibility of finding the defendant not guilty. The trial court did not issue instructions on the crimes of voluntary manslaughter or involuntary manslaughter. On the charge of second-degree murder, the trial court instructed the jury that:

> Second-degree murder is the unlawful killing of a
> human being with malice but without premeditation and
> deliberation. Second-degree murder differs from first-
> degree murder in that the State need not prove a specific
> intent to kill, premeditation, deliberation or that the killing
> was committed in the perpetration of a felony.
>
> In order for you to find the defendant guilty of
> second-degree murder, the State must prove beyond a
> reasonable doubt that the defendant acted—let me start
> over. In order for you to find the defendant guilty of second-
> degree murder, the State must prove beyond a reasonable
> doubt that the defendant intentionally and with malice
> wounded the victim with a deadly weapon thereby
> proximately causing the victim's death.
>
> If the State proves beyond a reasonable doubt that
> the defendant intentionally inflicted a wound upon the
> victim with a deadly weapon that proximately caused the
> victim's death, you may infer, first, that the killing was
> unlawful and, second, that it was done with malice, but you

are not compelled to do so. You may consider the inferences along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice. If the killing was unlawful and was done with malice, the defendant would be guilty of second-degree murder.

If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant intentionally and with malice wounded the victim with a deadly weapon and that this proximately caused the victim's death, it would be your duty to return a verdict of guilty of second-degree murder. If you do not so find or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty.

¶ 17 On the issue of malice, the trial court charged the jury that:

Malice means not only hatred, ill will or spite, as it is ordinarily understood—to be sure, that is malice—but it also means that condition of mind that prompts a person to take the life of another intentionally or to intentionally inflict a wound with a deadly weapon upon another which proximately results in her death, without just cause, excuse or justification.

¶ 18 This language largely conforms with the pattern jury instruction for "Second Degree Murder Where a Deadly Weapon Is Used, Not Including Self-Defense, Covering All Lesser Included Homicide Offenses," which defines malice as:

[N]ot only hatred, ill will, or spite, as it is ordinarily understood-to be sure, that is malice-but [it also means that condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in another's death, without just cause, excuse or justification.] [malice also arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly

as to manifest a mind utterly without regard for human life
and social duty and deliberately bent on mischief].

N.C.P.I.—Crim. 206.30A.

Defendant objected, first during the jury charge conference and again prior to the reading of the jury's verdict, to the trial court's failure to submit instructions on voluntary manslaughter and involuntary manslaughter as options to the jury.

At the conclusion of defendant's trial on 11 December 2019, the jury returned a verdict of guilty of second-degree murder after more than five hours of deliberation. While deliberating, the jury asked to review Mrs. Brichikov's autopsy and toxicology reports, records concerning the duration of defendant's stay at The Healing Place, and Mrs. Brichikov's and defendant's cellular telephone records. During the sentencing phase of defendant's trial, the jury found three aggravating factors: that (1) his offense was especially heinous, atrocious, or cruel; (2) he was in willful violation of a condition of parole or post-release supervision; and (3) he had taken advantage of a position of trust or confidence in order to commit his offense. The trial court sentenced defendant to a minimum term of incarceration of 338 months and a maximum term of 418 months. Defendant appealed to the Court of Appeals, arguing that the trial court had erred by failing to submit to the jury his requested jury instruction on involuntary manslaughter since the jury could have found that he had assaulted his wife in a culpably negligent manner or that his failure to render aid to her was a culpably negligent omission.

¶ 21   In an opinion filed on 18 January 2022, *State v. Brichikov*, 281 N.C. App. 408, 2022-NCCOA-33, a divided panel of the Court of Appeals vacated defendant's conviction and remanded his matter for a new trial. The majority first dispensed of defendant's negligent omission theory since the pattern jury instruction on involuntary manslaughter does not address negligent omissions and thus he would have had to submit his request for the instruction in writing for the trial court's failure to give such an instruction to be considered error. *Brichikov*, ¶ 17; *see also* *State v. McNeill*, 346 N.C. 233, 240 (1997); *State v. Martin*, 322 N.C. 229, 237 (1988). However, the lower appellate court ultimately held that defendant was entitled to a pattern jury instruction on the lesser-included offense of involuntary manslaughter under a theory of negligent action since the evidence, viewed in the light most favorable to defendant, tended to negate the "malice" element of second-degree murder and because there was a reasonable possibility that a different result would have been reached at trial if this instruction had been given. *Brichikov*, ¶¶ 31, 35.

¶ 22   The dissenting judge of the Court of Appeals panel disagreed that the trial court's failure to render an instruction on involuntary manslaughter amounted to prejudicial error. Specifically, the dissent took an opposing view on the "issue of whether the trial court's refusal to grant defendant's request for a lesser-included instruction on involuntary manslaughter contained in the pattern jury instructions was error" because, from "the jury finding beyond a reasonable doubt that this offense

was especially heinous, atrocious, or cruel as an aggravating factor, it appears clear that the verdict would not have been different had the trial judge given the lesser included involuntary manslaughter instruction." *Brichikov*, ¶ 39 (Carpenter, J., dissenting).

¶ 23      The State filed a timely notice of appeal pursuant to N.C.G.S. § 7A-30(2) based upon the dissent filed in the lower appellate court's consideration of this matter. Since no petitions for discretionary review have been allowed in this matter, we therefore limit our review to those issues raised by the dissent: whether the trial court erred by declining to issue a pattern jury instruction on involuntary manslaughter and whether this error was prejudicial in light of the jury's finding that defendant's offense was "especially heinous, atrocious, or cruel."

## II.      Analysis

¶ 24      "The jury charge is one of the most critical parts of a criminal trial." *State v. Walston*, 367 N.C. 721, 730 (2014). When a "defendant's request for [an] instruction [is] correct in law and supported by the evidence in the case, the trial court [is] required to give the instruction, at least in substance." *State v. Shaw*, 322 N.C. 797, 804 (1988) (citing *State v. Howard*, 274 N.C. 186, 199 (1968)). For over a century, we have held, specifically, that "when there is evidence tending to support a verdict of guilty of an included crime of lesser degree than that charged," the trial court "must instruct the jury that it is permissible for them to reach such a verdict if it accords

with their findings." *State v. Hicks*, 241 N.C. 156, 160 (1954) (citing *State v. Jones*, 79 N.C. 630, 631 (1878) ("It was [defendant's] privilege to have the State's evidence applied to any theory justified by it . . . . This right he demanded in his prayer for instructions which ought to have been given.")).

¶ 25        In order to be granted a new trial for the trial court's failure to instruct the jury on a lesser-included offense, a criminal defendant must demonstrate that there was evidence presented at trial that, viewed in the light most favorable to the defendant, would permit a rational jury to acquit the accused of the greater charge and convict him or her of the lesser offense. Upon reviewing the trial record, we agree that there was sufficient evidence adduced at defendant's trial to permit a rational jury to acquit him of second-degree murder and to convict him of involuntary manslaughter. We further hold that there was a reasonable possibility that the jury would have acquitted defendant of the greater offense and convicted him of the lesser offense in the event that both instructions had been given to the jury. Accordingly, we affirm the decision of the Court of Appeals.

¶ 26        We begin by observing that the dissenting judge at the Court of Appeals wed the dissent's view that the trial court did not commit error in the present case to the dissent's position that the verdict would not have been different had an instruction on involuntary manslaughter been given by concluding that the dissent "would find no error in the trial court's decision to decline to deliver an instruction to the jury on

involuntary manslaughter *because* the jury's verdict would not have been different had the instruction been given." *Brichikov*, ¶ 44 (Carpenter, J., dissenting) (emphasis added). However, since the dissenter on the Court of Appeals panel paid some tribute to the Court of Appeals majority's position on the element of malice and since the analyses for error and prejudice overlap significantly in this area of law, we shall discuss both aspects in turn in order to develop our appreciation for the ultimate issue before us: whether there was a reasonable possibility that the jury might have convicted defendant of involuntary manslaughter as opposed to second-degree murder, if the jury had been instructed on both offenses.

¶ 27    "An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater." *State v. Millsaps*, 356 N.C. 556, 561 (2002) (citing *State v. Conaway*, 339 N.C. 487, 514). "It is well settled that a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts. On the other hand, the trial court need not submit lesser degrees of a crime to the jury when the State's evidence is positive as to each and every element of the crime charged *and there is no conflicting evidence relating to any element of the charged crime.*" *State v. Drumgold*, 297 N.C. 267, 271 (1979) (extraneity omitted). "The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every

element of the offense . . . and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of [the lesser-included offense]." *State v. Strickland*, 307 N.C. 274, 293 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193 (1986).

¶ 28 We exercise review here in order to determine whether the State provided sufficient evidence to fully satisfy its burden of proving each element of second-degree murder beyond a reasonable doubt and if any other evidence tended to negate those elements when viewed in the light most favorable to defendant. Specifically, we focus on the element of malice since involuntary manslaughter is "the unlawful and unintentional killing of another *without malice* which proximately results from an unlawful act not amounting to a felony nor naturally dangerous to human life, or by an act or omission constituting culpable negligence." *Johnson*, 317 N.C. at 205 (emphasis added). Malice can be shown in at least three ways: (1) actual malice, a "positive concept of express hatred, ill-will or spite"; (2) an act inherently dangerous to human life that is "done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief"; or (3) "that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." *State v. Reynolds*, 307 N.C. 184, 191 (1982) (extraneity omitted).

First, we note that "an instruction to the jury that the law implies malice and unlawfulness from the intentional use of a deadly weapon proximately resulting in death is not a conclusive irrebuttable presumption." *State v. Holder*, 331 N.C. 462, 487 (1992). "When the killing with a deadly weapon is admitted . . . two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree." *State v. Fisher*, 318 N.C. 512, 525 (1986) (quoting *State v. Gordon*, 241 N.C. 356, 358 (1955)). This presumption is only mandatory, however, in the sense that, the "defendant, to avoid its effect, must produce some evidence raising an issue on the existence of malice and unlawfulness or rely on such evidence as the state may have adduced. *In the presence of evidence raising such issues, the presumption disappears altogether, leaving only a permissible inference which the jury may accept or reject.*" *Reynolds*, 307 N.C. at 190 (emphasis added). Here, the trial court properly instructed the jury that it could, but was not compelled to, infer malice from the fact that defendant intentionally inflicted a wound upon his victim Mrs. Brichikov with a deadly weapon in the form of his hands.

In the alternative, the State contends that defendant's actions were "inherently dangerous and done in [such] a fashion that had no regard for human life or social duty" and thus satisfy the second theory of malice. However, the "distinction between 'recklessness' indicative of murder and 'recklessness' associated with manslaughter is one of degree rather than kind." *State v. Rich*, 351 N.C. 386, 393

(2000) (extraneity omitted). The criminal negligence required to support a charge of involuntary manslaughter "is something more than actionable negligence in the law of torts; it is such recklessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others." *State v. Massey*, 271 N.C. 555, 557 (1967) (extraneity omitted). Defendant's acts, viewed in the light most favorable to him, squarely meet the standard for criminal negligence, but do not conclusively rise to the degree of recklessness evincing an utter disregard for human life or a mind deliberately bent on mischief.

¶ 31 Indeed, the evidence adduced at defendant's trial permits a finding by a jury that he acted intentionally and recklessly in assaulting his wife, but without hatred, an intent to take Mrs. Brichikov's life, or "a mind utterly without regard for human life." *See Reynolds*, 307 N.C. at 191. Specifically, the jury heard testimony and received evidence that tended to show the following: that defendant and Mrs. Brichikov arranged to get together on 21 April 2018 after expressing love, concern, and fidelity for one another; that they consumed alcohol and opioids together over the course of several hours without any apparent violence between them; that something provoked a confrontation between them in the early hours of 22 April 2018; that defendant left the motel room after having assaulted his wife but before she had expired; that Mrs. Brichikov's movements when defendant exited the room for the

last time were consistent with a fentanyl overdose; and that her death likely would not have occurred in the absence of her preexisting heart condition and state of intoxication.

¶ 32          Taken together, a rational juror could conclude that defendant had acted with culpable negligence in assaulting his wife and leaving her behind while she suffered a drug overdose or heart attack that was at least partially exacerbated by his actions, but that it was done without malice given the potentially volatile and drug-induced confrontation erupting between them in the twenty-six minutes between 3:43 a.m. and 4:09 a.m. and the unpredictability of Mrs. Brichikov's subsequent death. *See State v. Wilkerson*, 295 N.C. 559, 583 (1978) ("[A] mere assault which proximately results in death, but which does not indicate a total disregard for human life and is committed with no intent to kill or to inflict serious bodily injury, will support, at most, a verdict of involuntary manslaughter."). Because the evidence elicited by defendant was sufficient to support a verdict of involuntary manslaughter as the lesser-included offense of second-degree murder, the trial court erred by declining to issue a jury instruction on that offense.

¶ 33          Failure to submit a requested jury instruction on a lesser-included offense when one is warranted is generally reversible error. *See State v. Price*, 344 N.C. 583, 589 (1996) ("Our law states that when the court improperly fails to submit a lesser included offense of the offense charged, and the jury had only two options in reaching

a verdict—guilty of the offense charged and not guilty—then a verdict of guilty of the offense charged is not reliable, and a new trial must be granted."). However, an error does not require reversal unless it is found to be prejudicial under the harmless error analysis provided by N.C.G.S. § 15A-1443. For an error which does not arise under the Constitution of the United States, a criminal defendant bears the burden of demonstrating a "reasonable possibility" that had the error not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (2021). This is a non-exacting inquiry that considers, *inter alia*, the strength of the State's evidence supporting defendant's conviction and whether the jury's considerations tended to suggest that it may have been persuaded to adopt a different finding had it been given the excluded instruction. *See State v. Keller*, 374 N.C. 637, 649 (2020).

¶ 34        This Court finds no prejudicial effect for a trial court's failure to submit instructions on voluntary manslaughter or involuntary manslaughter in cases where both first-degree murder and second-degree murder instructions are submitted to the jury and the jury renders a verdict of first-degree murder based on premeditation and deliberation. *Price*, 344 N.C. at 590. However, where a jury convicts a criminal defendant of second-degree murder in the absence of an instruction on a lesser-included offense, appellate courts are *not* permitted to infer that there is no reasonable possibility that the jury would have convicted the defendant of the lesser-included offense on the basis of that conviction, *State v. Thacker*, 281 N.C. 447, 456

(1972). A jury may feel compelled to convict a criminal defendant of *some* offense in light of the gravity of the accused's admitted transgressions, especially in a case such as the one here. *See Keeble v. United States*, 412 U.S. 205, 212 (1973) ("Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction."); *State v. Thomas*, 325 N.C. 583, 599 (1989) (holding that a jury must "be permitted to consider whether [the] defendant was guilty of the lesser-included offense of involuntary manslaughter and not be forced to choose between guilty as charged or not guilty" where "almost all the evidence point[ed] to some criminal culpability on [the] defendant's part"). In the instant case, the jury had no option presented to it other than to either convict defendant of murder or to acquit him. Consequently, the trial court's failure to charge the jury on the crime of involuntary manslaughter cannot be found harmless as a result of the jury's verdict.

¶ 35       Likewise, we decline to infer from the jury's determination of the aggravating factor that defendant's offense was "especially heinous, atrocious, or cruel" that there is no reasonable possibility that it would have convicted him of involuntary manslaughter instead of second-degree murder had it been instructed as to both offenses. The jury at defendant's trial found that his offense was "especially heinous, atrocious, or cruel" during the sentencing phase of his trial after having convicted him of second-degree murder. The trial court did not elaborate on the meaning or

significance of such a finding. The State did not provide any additional evidence to support this finding, instead relying upon the evidence presented at trial establishing Mrs. Brichikov's significant facial injuries and the struggle portrayed by the crime scene. It is not as clear to us, as it was to the dissent at the lower appellate court, how the jury "gave substantially the same consideration to the evidence" in finding the presence of this aggravating factor "that it would have given in the determination of the presence of malice." *Brichikov*, ¶ 42 (Carpenter, J., dissenting).

¶ 36        Indeed, a criminal defendant can be both convicted of involuntary manslaughter *and* have his crime found to have been "especially heinous, atrocious, or cruel." *See, e.g., State v. West*, 103 N.C. App. 1, 11–12 (1991); *State v. Shadrick*, 99 N.C. App. 354, 355–56 (1990). Since, as the Court of Appeals has held, "[i]nvoluntary manslaughter differs from second degree murder only in that malice is present in the latter but not the former," *State v. Allen*, 77 N.C. App. 142, 145 (1985), it necessarily follows that a finding that a criminal defendant committed a homicide offense in an especially heinous, atrocious, or cruel way does not require a finding that he acted with malice in bringing about his victim's death. As such, we do not believe that the jury's finding that defendant acted in an especially heinous, atrocious, or cruel way in the instant case serves as the jury's definite rejection of the evidence tending to undermine his conviction for second-degree murder. Rather, we discern that the jury could have found both that defendant had acted with especial heinousness,

atrociousness, or cruelty in assaulting his wife *and* that he lacked malice in causing her subsequent death. We refuse to speculate about any insight the jury's findings at defendant's subsequent sentencing proceeding may give us into what the jury would have or would not have considered persuasive as to the element of malice prior to its rendition of the verdict in defendant's case.

¶ 37 We hold that the trial court's refusal to instruct the jury on the criminal offense of involuntary manslaughter was prejudicial error warranting reversal due to (1) the strength of the evidence tending to undermine the State's contention of malice, and (2) the jury's consideration of various factors, including Mrs. Brichikov's toxicology report and the record of her communications with defendant prior to their meeting on 21 April 2018, suggesting that it may have struggled with its decision to convict defendant of murder and could have used such evidence to support a finding of involuntary manslaughter instead if the jury had been so instructed. We therefore conclude that there is a reasonable possibility that, had the jury been instructed on involuntary manslaughter, it would have returned a verdict of guilty of involuntary manslaughter rather than a verdict of second-degree murder.

## III.    Conclusion

¶ 38 In light of our determination that the trial court committed prejudicial error by declining defendant's request to issue a pattern jury instruction on involuntary

manslaughter, we affirm the decision of the Court of Appeals, in which it vacated

defendant's judgment and determined that defendant was entitled to a new trial.

AFFIRMED.

Justice BERGER dissenting.

The evidence at trial tended to show that Nadia Flores was beaten so badly that her face was "unrecognizable," and officers responding to the scene of her murder could not identify her body through photographs. Defendant admitted that he assaulted Ms. Flores.[1]

The medical examiner who performed the autopsy on Ms. Flores noted that she had "numerous blunt force injuries" and that she had a broken nose, broken zygomatic arches, and a broken jaw. Her injuries were so extensive that "the central portion of her face . . . could shift without moving the rest of the head," and the medical examiner "could feel bone grinding on bone as those fractures, those breaks, shifted against one another." In addition to the multiple broken bones in her face, Ms. Flores had lacerations to her head, a contusion, bruising to her neck, and bite marks on her back.

According to the medical examiner, Ms. Flores's injuries were the result of "substantial force" equivalent to a long-distance fall or car crash. The medical examiner testified that the "cause of death was physical assault, including blunt force injuries" with drug use and a cardiac event as contributing conditions. A forensic pathologist testified that the "primary cause" of Ms. Flores's death was "multiple

---

[1] Ms. Flores was initially identified as Nadia Natasha Brichikov. However, the medical examiner testified that he corrected "the name to Nadia Flores later by comparison of proper information given on the death certificate."

blunt force trauma to face, head and neck" as a result of the assault. Defendant's own expert conceded that the effects of the assault contributed to Ms. Flores's death.

¶ 42        "Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation." *State v. Foust*, 258 N.C. 453, 458, 128 S.E.2d 889, 892 (1963). "An intent to inflict a wound which produces a homicide is an essential element of murder in the second degree." *State v. Williams*, 235 N.C. 752, 753, 71 S.E.2d 138, 139 (1952). "While an intent to kill is not a necessary element of murder in the second degree, that crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death." *State v. Snyder*, 311 N.C. 391, 393, 317 S.E.2d 394, 395 (1984).

¶ 43        To the extent there was an error in the jury instructions, the error worked in defendant's favor. The jury should have been instructed that if it determined beyond a reasonable doubt that "defendant intentionally assaulted the deceased with his hands, fists, or feet, *which were then used as deadly weapons,* and that her death was a proximate result of his acts, then the law presumes malice and . . . defendant must be convicted of murder in the second degree." *State v. Lang*, 309 N.C. 512, 526–27, 308 S.E.2d 317, 324–25 (1983). "The effect of the presumption is to impose upon the defendant the burden of going forward with or producing some evidence of a lawful reason for the killing or an absence of malice." *State v. Simpson*, 303 N.C. 439, 451, 279 S.E.2d 542, 550 (1981). When a defendant produces no evidence that the killing

was lawful or that it was committed without malice, the jury should be instructed that the defendant must be convicted of second-degree murder. *Lang*, 309 N.C. at 526, 308 S.E.2d at 324.

¶ 44 Both the Court of Appeals and the majority today misconstrue the effect of these mandatory presumptions. Controlling precedent from this Court dictates that once these presumptions arise, a burden is imposed on a criminal defendant to rebut these presumptions. In this case, defendant failed to produce any evidence to overcome these presumptions of unlawfulness and malice. In fact, defendant admitted that he assaulted Ms. Flores, and his own expert confirmed that Ms. Flores's death was nonaccidental and proximately caused by the assault.

¶ 45 Because defendant failed to rebut the mandatory presumption of malice, a properly instructed jury would have been compelled to find that defendant acted with malice if it found that defendant intentionally assaulted the victim with his hands, which were used as deadly weapons, and that the victim's death was proximately caused by such an assault. The trial court instructed the jury only that an inference of unlawfulness and malice arose. This error by the trial court worked to defendant's advantage in that the jury had to deliberate and decide the issue of malice in the absence of the presumptions referenced above. The majority either inadvertently misses this step in its analysis, or it has implicitly overruled longstanding precedent.

¶ 46    Because "the State's evidence [wa]s positive as to each and every element of [second-degree murder] and there [wa]s no conflicting evidence relating to any element of the charged crime," *State v. Harvey*, 281 N.C. 1, 13–14, 187 S.E.2d 706, 714 (1972), the trial court was not required to instruct the jury on involuntary manslaughter.

¶ 47    Defendant's argument and the majority's discussion of involuntary manslaughter is misplaced. There is no evidence from which defendant was entitled to an instruction on the lesser offense because not only was malice presumptively established and not rebutted, but the evidence did not meet the elements of involuntary manslaughter. *See State v. Wallace*, 309 N.C. 141, 145, 305 S.E.2d 548, 551 (1983).

¶ 48    "Involuntary manslaughter is the unintentional killing of a human being without either express or implied malice (1) by some unlawful act not amounting to a felony [o]r naturally dangerous to human life, or (2) by an act or omission constituting culpable negligence." *State v. Wilkerson*, 295 N.C. 559, 579, 247 S.E.2d 905, 916 (1978). Stated another way, the crime of involuntary manslaughter is committed "[w]here death results unintentionally, . . . from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done." *Foust*, 258 N.C. at 459, 128 S.E.2d at 893 (quoting *State v. Hovis*, 233 N.C. 359, 365, 64 S.E.2d 564, 568 (1951)). "To constitute involuntary manslaughter, the homicide must have

been without intention to kill or inflict serious bodily injury, and without either express or implied malice." *Id.*

The majority's focus on malice, though relevant, is not determinative in this case given defendant's intentional and felonious assault upon Ms. Flores.[2] Moreover, the majority's discussion of culpable negligence misses the mark because the intentional, felonious assault was not "a lawful act negligently done." *Id.* Defendant's actions here do not satisfy the elements of involuntary manslaughter, and this Court should reverse the Court of Appeals.

I respectfully dissent.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.

---

[2] Although not argued, defendant's assertions, and much of the majority's reasoning, appear to align more appropriately with the offense of voluntary manslaughter committed in a sudden heat of passion. *See State v. Rummage*, 280 N.C. 51, 56, 185 S.E.2d 221, 225 (1971) ("Manslaughter is the unlawful killing of another without malice, and, under given conditions, this crime may be established, though the killing has been both unlawful and intentional." (cleaned up)).